Garry L. PLOTKIN, Appellant,

v.

Charles L. JOEKEL, Individually and d/b/a Trendsetter Staffing, Inc.; Texas Staffing Services, Inc. d/b/a Trendsetter Staffing; Kenneth Joekel, Individually and d/b/a America's Skilled Personnel; and F.W. Services, Inc., Appellees.

Charles L. Joekel, Individually and d/b/a Trendsetter Staffing, Inc., and Kenneth Joekel, Individually and d/b/a America's Skilled Personnel, Appellants,

v.

Garry L. Plotkin; Chad Plotkin; CJP Financial Services, Inc.; CJP Resources, Inc.; and Your Recruiters, Inc., Appellees.

No. 01–06–00624–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 25, 2009.

Rehearing Overruled Oct. 27, 2009.

Alan N. Magenheim, Magenheim & Associate, Joseph Leo Lanza, Richard Haynes, Richard Haynes & Associates, P.C., Mark Ryan Trachtenberg, Haynes & Boone, LLP, Houston, TX, Olney G. Wallis, Llano, TX, for Appellant.

Joel M. Androphy, Sarah Mary Frazier, Berg & Androphy, Lynne Liberato, Haynes & Boone, L.L.P., Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, BLAND, and TAFT.

## OPINION

TIM TAFT,* Justice.

This is a dispute among various people and entities engaged in various employee staffing businesses. The parties asserted claims, counterclaims, and third-party claims. Each party against whom any claim had been asserted moved for traditional or no-evidence summary judgment. The trial court granted all summary-judgment motions and rendered a take-nothing judgment against all claims asserted by any party. We determine whether the trial court erred in doing so. We affirm the judgment in part, reverse it in part, and remand the case.

## Background

### A. The Primary People and Businesses

Garry Plotkin and Charles Joekel were friends who had known each other for many years. Garry's son was Chad Plot-

kin, and Charles's son was Kenneth Joekel.

Garry and Charles began doing business together in the 1980s. In 1990, Charles transferred to Garry his payroll-services business,[1] called Able Ones of Texas, Inc. Garry took over the business under a new corporation that he formed, called Texas Personnel Services. Texas Personnel Services eventually became Westbury Worldwide Services, Inc. d/b/a Worldwide Services ("Worldwide") some time before 1998. The parties dispute whether Worldwide, which began as a staff-leasing business, later began operating a skilled-labor business,[2] as well.

Charles owned, and was sole officer of, Texas Staffing Services, Inc. ("Texas Staffing") d/b/a Trendsetter Staffing and d/b/a Trendsetter Skilled. The parties represent that Texas Staffing handled its staff-leasing business under its Trendsetter Staffing d/b/a, whereas Texas Staffing handled its skilled-labor business under its Trendsetter Skilled d/b/a.

### B. The Sale

On June 8, 1998, Garry, through an attorney's letter, proposed to sell Worldwide's book of business, its goodwill, and its furniture, fixtures, and equipment. That letter read:

Dear Charles,

Garry has requested that I make the following proposal to you regarding the referenced sale:

---

* The Honorable Tim Taft, who retired from the First Court of Appeals effective June 1, 2009, continues to sit by assignment for the disposition of this case, which was submitted on June 24, 2008.

1. The record indicates that a payroll-services business—also called an employee-leasing or staff-leasing business—is a business that assumes a client's employees in order, for a fee, to administer the client's business payroll,

employment-related taxes, worker's compensation insurance, and other employee benefits. For simplicity's sake, we will use the term "staff-leasing" business throughout the remainder of the opinion.

2. The record indicates that a skilled-labor business is one providing temporary skilled labor.

1. *Charles* will purchase the good will of *Worldwide* for $150,000.00 to be payable at closing.

2. *Trendsetter Staffing* will purchase all furniture, fixtures and equipment from *Worldwide* for $50,000.00 to be payable at closing.

3. *Charles* will purchase the client list and book of business from *Worldwide* for a total of 1,500,-000.00. . . .

4. If *Trendsetter* is sold prior to December 31, 1999, *Worldwide* will receive 25% of the net sale proceeds less any amounts which have already been paid to *Worldwide* in a total amount not to exceed $2,500,000.00.

. . .

(Emphasis added.)

On June 11, 1998, Charles counter-offered by letter. The letter read:

Dear . . . Garry:

Thank you for the proposal regarding the purchase of Worldwide Services' book of business.

Notes:

1. Any purchase of *Trendsetter Staffing* will be a structured pay-out based upon a client retention; therefore, any agreement not similarly predicated would be imprudent on my part.

2. *The only parties to this Agreement are Charles and Garry, individually,* and the terms of this Agreement are private and confidential between them.

. . .

Having put my footnotes first, let me address your proposal paragraph by paragraph:

Paragraph # 1: Okay.

Paragraph # 2: Okay.

Paragraph # 3: On June 29, 1998, *Charles* will take control of the Worldwide book of business. Each week thereafter, *Charles* will pay *Garry* an amount equal to one and one-half percent (1½%) of the gross sales provided by those accounts formerly serviced by Worldwide per a list of accounts to be agreed upon. This will continue for 48 months or until $2 Million is paid to *Garry,* whichever occurs first. Garry may add to the "Worldwide accounts" at any time and will assist as called upon in the maintenance of said accounts to our mutual benefit.

Paragraph # 4: In the event Charles sells *Trendsetter* during the term of this Agreement, this Agreement will be terminated as follows: *Charles* will pay *Garry* the lesser of 1) $2,500,000.00 less amounts previously paid or 2) twenty-five percent (25%) of the gross sales price of *Trendsetter* less amounts previously paid.

. . .

(Emphasis added.)

On June 16, 1998, Garry and Charles executed two contracts: (1) an "Agreement" and (2) a "Bill of Sale." The Agreement, which concerned the sale of Worldwide's book of business, provided as follows:

The following represents our agreement regarding the sale by Westbury Worldwide Services, Inc. d/b/a Worldwide Services ("Worldwide") of its book of business to CHARLES L. JOEKEL upon the following terms and conditions:

CHARLES JOEKEL agrees to buy and GARRY PLOTKIN agrees to sell the book of business of WORLDWIDE SERVICES totaling approximately THIRTY MILLION AND NO/100 DOLLARS ($30,000,000.00) per year in annual sales and the sale price to be

received for said assets shall be paid as follows:

1. *JOEKEL/Trendsetter* will take control of the Worldwide book of business on June 29, 1998. Each week thereafter, *JOEKEL* will pay *PLOTKIN* an amount equal to 1½% of the gross sales of the accounts formerly serviced by Worldwide per a list of accounts to be agreed upon between the parties. This agreement will continue for forty-eight (48) months ending in June, 2002 or until a total of TWO MILLION AND NO/100 DOLLARS ($2,000,000.00) is paid to *GARRY PLOTKIN*, which ever comes first. PLOTKIN may add to the worldwide accounts at any time during the agreement and will assist *JOEKEL/TRENDSETTER* as called upon in the maintenance of said accounts to the mutual benefit of the parties.

2. In the event that JOEKEL sells *Trendsetter* during the term of this agreement ..., this agreement will be terminated. *JOEKEL* will pay *PLOTKIN* at that time the lesser of:

(1) TWO MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($2,500,000.00) less any amounts previously paid or

(2) Twenty-five percent (25%) of the *gross sales price received* for *Trendsetter* less any amounts previously paid to *GARRY PLOTKIN*.

. . .

BY: _____/s/_____
 *GARRY L. PLOTKIN*

BY: _____/s/_____
 *CHARLES L. JOEKEL*

(Emphasis added.)

The Bill of Sale, which was executed the same day for the sale of Worldwide's good-will, furniture, fixtures, and equipment, provided in pertinent part as follows:

KNOW ALL MEN BY THESE PRESENTS that *WESTBURY WORLDWIDE SERVICES, INC., D/B/A WORLDWIDE SERVICES* ("Transferor"), in consideration of TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($200,000.00) and other good and valuable consideration to be paid by *TEXAS STAFFING SERVICE, INC. D/B/A TRENDSETTER STAFFING* ("Transferee") no later than December 31, 1998, we hereby sell, transfer, assign and convey unto Transferee ... all of the right, title and interest of Transferor in and to the furniture, fixtures, equipment and goodwill of Transferor. . . .

. . .

WESTBURY WORLDWIDE SERVICES, INC., D/B/A WORLDWIDE SERVICES

BY: _____/s/_____
 *GARRY L. PLOTKIN, PRESIDENT*

TEXAS STAFFING SERVICE, INC. D/B/A TRENDSETTER STAFFING

BY: _____/s/_____
 *CHARLES L. JOEKEL, PRESIDENT*

(Emphasis added.)

It is undisputed that, for the term of the agreement, Charles periodically tendered 1½% commissions to Garry, but Garry did not take them. The parties dispute why Garry declined to take his commissions. The parties also dispute whether Worldwide's book of business that was sold contained only staff-leasing accounts or contained both these accounts and skilled-labor accounts.

### C. The Problem

In April 2001, during the term of the Agreement, Charles sold Texas Staffing's

staff-leasing business (operated under the d/b/a Trendsetter Staffing) to Simplified Employment Services ("SES"). SES did not want to purchase Texas Staffing's skilled-labor accounts. Before the sale of Texas Staffing's staff-leasing business to SES, Charles sold or transferred all of Texas Staffing's skilled-labor accounts to F.W. Services, Inc. d/b/a Pacesetter Personnel and d/b/a America's Skilled Personnel ("F.W. Services"), his son Kenneth's corporation. Garry received no commissions from any of the skilled-labor accounts that were transferred to F.W. Services, nor did he receive a percentage of the value of these accounts. The parties dispute the reason for this.

SES purchased Texas Staffing's staff-leasing business for $3,000,000. After having paid only $700,000 of the total sales price, SES filed for bankruptcy. The remaining $2,300,000 was never paid. Charles paid Garry $175,000, which was 25% of the $700,000 that SES actually paid. The parties dispute how much Garry was owed from the sale to SES. The parties also dispute whether Garry was owed pre-sale commissions.

### D. The Involvement of Other Family Members and Employees

Chad Plotkin owned, and was the officer and director of, two corporations that provided factoring[3] to employee-leasing businesses: CJP Resources, Inc. ("CJP Resources") and CJP Financial Services, Inc. ("CJP Financial"). Chad also owned a third corporation, Your Recruiters, Inc. ("Your Recruiters"). CJP Financial provided factoring services to a former F.W. Services employee, Terrell Diamond, who

left F.W. Services in the 1990s to start her own staff-leasing business.

Larry Plotkin, Garry Plotkin's twin brother, incorporated LWP Resources d/b/a Huntington Resources, Inc. ("Huntington") to provide factoring services. Huntington provided factoring services to Jeffrey Cash Cary, a former F.W. Services's employee who left in May 2002 to open a staff-leasing business in San Antonio.

The parties dispute whether (1) Garry enticed Diamond and Cary away from F.W. Services; (2) Garry enticed a third F.W. Services employee, Todd Murphy, to leave the company in the 1990s to start a staff-leasing business; (3) Cary breached a non-competition agreement with F.W. Services by opening a staff-leasing business in San Antonio; and (4) Garry, Chad, CJP Financial, CJP Resources, and Your Recruiters conspired to lure away these F.W. Services employees in order to profit from providing factoring services to their new businesses.

### E. The Suit

In May 2004, Garry sued Charles, Texas Staffing, Kenneth, and F.W. Services. He sued Charles and Texas Staffing for, among other things, (1) breach of express contract for failure to pay him 25% of the $3 million sales price to SES and for transferring to Kenneth the skilled-labor accounts that had been Worldwide's without compensation to Garry and (2) breach of fiduciary duty for converting commissions that Charles had allegedly held for him under separate verbal agreement. Garry sued Kenneth and F.W. Services for breach of implied-in-law contract, based on the theory that Kenneth and F.W. Ser-

---

**3.** The record indicates that factoring is a form of financing, often used in the staff-leasing business, in which a company's accounts receivable serve as collateral for loans. The factoring company holds the accounts receivable, collects the money owed on them, and then sends the money to the client company when requested.

vices knew that the skilled-labor accounts that Charles transferred to them before the SES sale contained Worldwide skilled-labor accounts, resulting in a fraudulent conveyance that unjustly enriched these defendants. Garry also sued some or all of these defendants for fraud, Uniform Fraudulent Transfer Act[4] ("UFTA") violations, money had and received, quantum meruit, and quantum valebant. He sought actual and punitive damages and disgorgement.

Charles and Texas Staffing counterclaimed against Garry for (1) breach of fiduciary duty; (2) fraud and misrepresentations, based on Garry's misrepresentations that Worldwide's book of business was worth $30 million and that Garry would continue to assist with Worldwide accounts after the Agreement's execution; and (3) breach of contract, based on Garry's promise to continue to assist with maintenance of Worldwide accounts.

Kenneth and F.W. Services counterclaimed against Garry for (1) breach of fiduciary duty for Garry's luring F.W. Services's employees away to establish competing businesses for his or his family's profit; (2) tortious interference with existing and prospective contracts, including interference with (a) existing staff-leasing contracts in Houston and San Antonio, (b) F.W. Service's non-competition agreement with Cary, and (c) an agreed temporary injunction between Cary and F.W. Services; (3) fraud, for misrepresentations (a) that Garry would be loyal and able to maintain confidentiality of information obtained from these defendants, (b) that he would not do anything to these defendants' business success, and (c) that he did not have a continuing relationship with Cary, Diamond, or Murphy; and (4) conspiracy to destroy their business by establishing factoring businesses to finance former F.W. Services employees whom Garry had lured away for that purpose.

Kenneth and F.W. Services also asserted third-party claims against Chad Plotkin, CJP Financial, CJP Resources, and Your Recruiters for (1) tortious interference with existing and prospective contracts, including interference with existing staff-leasing contracts in Houston and San Antonio, with F.W. Service's non-competition agreement with Cary, and with an agreed temporary injunction between Cary and F.W. Services, and (2) conspiracy to destroy their business by factoring the new businesses of former F.W. Services employees whom Garry had lured away for that purpose.

## F. The Summary–Judgment Motions and Ruling

Each party against whom any claim, counterclaim, or third-party claim had been asserted moved for traditional or no-evidence summary judgment. There were five summary-judgment motions filed in all.

The trial court granted all motions for summary judgment without stating its reasons and rendered a take-nothing judgment on all claims, counterclaims, and third-party claims asserted by any party. The court denied Garry's motion for new trial.

### Summary–Judgment Standards

Traditional summary judgment under Texas Rule of Civil Procedure 166a(c) is proper only when a movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Gary E. Patterson & Assocs., P.C. v. Holub*, 264 S.W.3d 180, 190 (Tex.App.-Houston [1st Dist.] 2008, pet.

---

4. *See* Tex. Bus. & Com.Code Ann. §§ 24.001–.013 (Vernon 2009).

denied) (citing *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995) and Tex.R. Civ. P. 166a(c)). "A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if it conclusively establishes all elements of an affirmative defense." *Id.*

"A party may move for a no-evidence summary judgment under Texas Rule of Civil Procedure 166a(i) 'if there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial.'" *Id.* (quoting *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex.App.-Houston [1st Dist.] 1999, no pet.), and citing Tex.R. Civ. P. 166a(i)). "The trial court must grant the motion unless the nonmovant produces more than a scintilla of evidence raising a genuine issue of material fact on the challenged elements." *Id.* "In determining whether a respondent to a no-evidence motion for summary judgment has produced sufficient evidence to raise a genuine issue of material fact, courts are not required to search the record without guidance." *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 309 (Tex.App.-Houston [1st Dist.] 2007, no pet.). "But 'the respondent is not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements.'" *Id.* (quoting Tex.R. Civ. P. 166a(i) cmt).

"In reviewing the granting of either type of summary-judgment motion, we indulge every reasonable inference from the evidence in favor of the nonmovant, resolve any doubts arising from the evidence in its favor, and take as true all evidence favorable to it." *Patterson*, 264 S.W.3d at 190. "When an order granting summary judgment does not specify the grounds upon which the trial court ruled, we must affirm if any of the summary judgment grounds is meritorious." *Id.* (citing *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995)).

### Garry's Appeal

In a single issue, Garry raises several challenges to the summary-judgment rendered on certain of his claims. He also concedes that he does not challenge other claims and requests for damages or relief on which summary judgment was rendered.

### A. Bases for Judgment Not Challenged on Appeal

Garry does not appeal the summary judgment rendered on his claims for fraud, UFTA violations, conspiracy, money had and received, quantum meruit, and quantum valebant and on his requests for punitive damages and disgorgement, conceding that he failed to respond to the no-evidence summary-judgment motion's grounds attacking the elements of the cited claims, damages, and remedy. *See* Tex.R. Civ. P. 166a(i) ("The court must grant the [no-evidence summary-judgment] motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact."). Accordingly, we must affirm the summary judgment rendered on these claims and requests for relief or damages. *See Tricon Tool & Supply, Inc. v. Thumann*, 226 S.W.3d 494, 500 (Tex.App.-Houston [1st Dist.] 2006, pet. denied).

### B. Breach of Express Contract

Garry first contends that the trial court erred in rendering traditional and no-evidence summary judgment on his breach-of-express-contract claims against Charles and Texas Staffing.

### 1. Breach of the Verbal Agreement to Hold Garry's Commissions "in Trust"

A portion of Garry's appellate argument concerns the breach of a post-Agreement verbal contract for Charles to hold in trust Garry's 1½% commissions on former Worldwide accounts until Garry requested them. However, Garry did not plead this as part of his express breach-of-contract claim. Instead, the sole express contract that Garry's "live" petition alleged was that Charles and Texas Staffing had breached was the Agreement itself, specifically, by not having paid Garry 25% of the sale price of Texas Staffing accounts that were sold to SES and by not having compensated him for former-Worldwide accounts that had been transferred to F.W. Services. The only allegations that the live petition made concerning breach of a post-Agreement verbal contract to hold Garry's commissions in trust appeared in support of his claims for breach of fiduciary duty, UFTA violations, quantum valebant, quantum meruit, and money had and received and his requested remedy of disgorgement.

■■■ Texas follows a "fair notice" standard for pleading, in which the question is whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex.2000). "The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex.1982). The test of fair notice is whether an opposing attorney of reasonable competence, on review of the pleadings, can ascertain the nature and the basic issues of the controversy and the testimony probably relevant. *Bowen v. Robinson*, 227 S.W.3d 86, 91 (Tex.App.-Houston [1st Dist.] 2006, pet. denied).

■■■ We hold that under the facts of this case, Garry's breach-of-express-contract allegations against Charles and Texas Staffing based on the Agreement did not give fair notice of a breach-of-express-contract claim based on a subsequent, verbal agreement to hold commissions. First, Garry's petition alleged generally that he had accepted the commissions tendered under the Agreement, but that he had then entered into a verbal agreement for Charles to hold them in trust. These are allegations of a contract separate from the Agreement itself. The breach-of-express-contract allegations referenced only the Agreement, not a separate, verbal contract concerning commissions. Second, paragraph 2 of the Agreement entitled Garry to the lesser of $2.5 million, less commissions already paid, or 25% of the sales price received. Garry's petition alleged that the commissions held under this later, verbal agreement amounted to around $1.3 million. Two and a half million dollars less $1.3 million is still greater than the gross sales price received for the sale of SES. Accordingly, Garry's allegations limited his express-contract claim against Charles and Texas Staffing for breach of the Agreement to 25% of the sales price received. Given that the Agreement relegated him to this lesser sum, Garry's allegations did not provide fair notice that he was also claiming breach of a completely separate verbal agreement to hold commissions in trust.

Garry nonetheless argues that the sufficiency of his pleading was demonstrated by the fact that Charles and Texas Staffing's summary-judgment motion addressed a verbal agreement to hold commissions. We disagree. In their summary-judgment motion, Charles and Texas Staffing argued, under rule 166a(c), that

> Plaintiff's claim for express contract 'is based only on (1) amounts allegedly due upon sale of Trendsetter Staffing and (2) amounts allegedly due as a consequence

of an alleged transfer of accounts to Kenneth Joekel. *The claim conspicuously fails to include any allegation with respect to the non-payment of commissions. Nonetheless, even if the Court were inclined to read Plaintiff's pleadings to allege a claim for breach of contract based on commissions (and the Trendsetter Defendants object to and oppose such a reading)*, such claim fails as a matter of law. . . .

(Emphasis added.) Instead of showing that Charles and Texas Staffing read the petition to allege a breach-of-express-contract claim for breach of an oral agreement to hold commissions, this text shows that they did not read the petition that way, that they opposed any reading of the petition to include such an allegation, and that they addressed the issue only in the event that the court read the petition otherwise. After being put on notice that his petition did not allege such a theory, Garry declined to amend it to include such an alternative claim.

We overrule Garry's challenges that are based on this unpleaded express contract claim.

### 2. Breach of the June 18, 1998 Agreement

Garry also argues that the trial court erred in rendering a take-nothing summary judgment on his claim that Charles and Texas Staffing breached the Agreement by failing to pay him (1) 25% of the sale price of Texas Staffing accounts that were sold to SES and (2) compensation for the former-Worldwide accounts that were transferred to F.W. Services before the sale to SES.

#### a. Failure to Pay Garry for 25% of the Sale Price of the Texas Staffing Accounts to SES

The Agreement required that, upon sale of "Trendsetter" during the contract term,

Charles would pay Garry the lesser of $2.5 million or "Twenty-five percent (25%) of the *gross sales price received* for Trendsetter less any amounts previously paid to GARRY PLOTKIN." Garry contends that a fact issue exists regarding what the phrase "gross sales price received" means: the price of sale (Garry's interpretation—$3 million), or the amount of the sale price that the buyer actually paid (Charles's interpretation—$700,000). Specifically, Garry reads "gross sales price received" to mean "gross sales price to be received by the seller under the sales contract." Garry appears to argue both that the Agreement is unambiguous in this regard and that it is ambiguous; under the latter position, he further argues that we may consider the parties' pre-Agreement correspondence.

In construing a written contract, the primary concern is to ascertain and to give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex.2005). We consider the entire writing and attempt to harmonize and to give effect to all of the contract's provisions. *Id.* at 312. We construe contracts " 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' " and " 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.' " *Id.* (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). "The language in a contract is to be given its plain grammatical meaning unless doing so would defeat the parties' intent." *Amtech Elevator Servs. Co. v. CSFB 1998–P1 Buffalo Speedway Office Ltd. P'ship*, 248 S.W.3d 373, 379 (Tex. App.-Houston [1st Dist.] 2007, no pet.).

If, after the pertinent rules of construction are applied, the contract can

be given a definite or certain legal meaning, it is unambiguous, and we construe it as a matter of law. *Frost Nat'l Bank,* 165 S.W.3d at 312. However, if after such rules are applied, the meaning of the contract remains uncertain or is susceptible to more than one reasonable interpretation, it is ambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995); *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983). If a contract is ambiguous, the contract's interpretation becomes a fact issue to be resolved by deciding the parties' true intent, for which the fact finder may consider extraneous evidence of intent. *See Nat'l Union Fire Ins. Co.,* 907 S.W.2d at 520; *Coker,* 650 S.W.2d at 394–95. Whether a contract is ambiguous is a question of law to be determined "by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker,* 650 S.W.2d at 394.

▮▮▮▮ The Agreement does not define the term "gross sales price received." We give the words in this term their plain, ordinary, and generally accepted meaning because nothing in the Agreement evidences a contrary intent. *See Stahl Petroleum Co. v. Phillips Petroleum Co.,* 550 S.W.2d 360, 366 (Tex.Civ.App.-Amarillo 1977) (interpreting contractual term "weighted average price received" in same way for same reason, when term was left undefined in contract), *aff'd,* 569 S.W.2d 480 (Tex.1978). "[T]he phrase 'price received' ... consists of two terms of ordinary meaning. In the more common sense, ... the term 'price' means the amount of money received in exchange for

anything, and the transitive verb 'received' means to take as something paid or to accept payment." *Id.* Under this definition, the phrase "gross sales price received" unambiguously means the money that Charles and Texas Staffing actually received for the sale ($700,000), not the full contracted-for price, most of which went unpaid. *See Stahl Petroleum Co.,* 550 S.W.2d at 366; *see also Life Ins. Co. v. Verex Assurance, Inc.,* 810 S.W.2d 416, 418 (Tex.App.-Dallas 1991, no writ) (concluding, in context of mortgage insurance policy, that "sales price" meant cash received by seller upon transfer of property to buyer).[5] Because the term is unambiguous, we may not resort to extrinsic evidence—such as the June 11, 1998 pre-Agreement letter on which Garry relies—to alter its meaning. *See Stahl Petroleum Co.,* 550 S.W.2d at 367–68 (applying plain meaning of contractual term, despite evidence that parties' course of performance indicated that parties intended different meaning, when term was unambiguous).

We overrule this challenge under Garry's sole issue.

**b. Failure to Pay Garry Compensation for Former–Worldwide Accounts That Were Transferred to F.W. Services Before the Sale to SES**

Garry also sued Charles and Texas Staffing for breach of the Agreement based on the transfer of Texas Staffing's skilled-labor accounts to F.W. Services before the sale to SES, for which Garry received no payment. The Agreement provided:

---

**5.** Garry contends that the term is ambiguous because (1) he reads it to mean "gross sales price *to be* received by the seller under the sales contract" (emphasis added) and (2) the parties' differing interpretations of the same term mean that it is ambiguous. First, Garry's interpretation depends on the insertion of words into the phrase, not on the phrase's actual wording. Second, an ambiguity does not arise merely because the parties to the agreement have different interpretations of a term. *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999).

CHARLES JOEKEL agrees to buy and GARRY PLOTKIN agrees to sell *the book of business of WORLDWIDE SERVICES ...*

1. JOEKEL/ *Trendsetter* will take control of *the Worldwide book of business* on June 29, 1998. Each week thereafter, JOEKEL will pay PLOTKIN an amount equal to 1½% of the gross sales *of the accounts formerly serviced by Worldwide per a list of accounts to be agreed upon between the parties. ...*

2. In the event that JOEKEL sells *Trendsetter* during the term of this agreement ..., this agreement will be terminated. JOEKEL will pay PLOTKIN at that time the lesser of:

(1) TWO MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($2,500,000.00) less any amounts previously paid or

(2) Twenty-five percent (25%) of the gross sales price received for *Trendsetter* less any amounts previously paid to GARRY PLOTKIN.

(Emphasis added.)

In support of this breach-of-express-contract claim, Garry pleaded that Charles and Texas Staffing

first sold and/or conveyed the book of accounts from Trendsetter's skilled labor division [Trendsetter Skilled, a d/b/a of Texas Staffing] to [Charles's] son, and thereafter sold the remainder of the business to SES for $3,000,000. ... [T]he "skilled" labor accounts were first sold to Kenneth Joekel, with the remaining "staff" leasing labor accounts being sold to SES. Defendants owe the Plaintiff ... twenty-five percent of the value of the assets sold and/or conveyed by Charles Joekel to Kenneth Joekel.

Thus far, the only funds paid to the Plaintiff out of the two sales was $175,000.

Implicit in this allegation is the understanding that (1) Worldwide sold both skilled-labor and staff-leasing accounts under the Agreement and (2) the Agreement called for Garry to be paid when Texas Staffing sold *any* former Worldwide account (staff-leasing or skilled-labor).

Charles and Texas Staffing moved for traditional and no-evidence summary judgment on this claim on the following grounds:

- the Agreement's use of the term "Trendsetter" meant Texas Staffing d/b/a "Trendsetter Staffing," not Texas Staffing d/b/a "Trendsetter Skilled," as was shown by the contemporaneously executed Bill of Sale's reference to "Trendsetter Staffing";

- accordingly, the Agreement's requirement that Garry be paid 25% of the gross sales price received for "Trendsetter" meant that he be paid only for the sale of the Texas Staffing d/b/a Trendsetter Staffing, which held only staff-leasing accounts;

- the accounts held by Texas Staffing d/b/a Trendsetter Staffing (the only d/b/a holding former Worldwide accounts) were sold to SES, and the accounts held by Texas Staffing d/b/a Trendsetter Skilled (with skilled-labor accounts that were not bought from Worldwide) were sold or transferred to Kenneth;

- accordingly, Garry was entitled to 25% of the sales price received from SES, which he was paid.

- Because of the above, Garry could show neither breach nor damages.[6]

---

**6.** Charles and Texas Staffing also argued that Garry could produce no evidence of privity between himself and them. We discuss this summary-judgment basis further below.

In support, Charles and Texas Staffing produced and cited Chad Plotkin's deposition testimony, in which he testified that the accounts bought from Worldwide were recorded separately from other accounts in the Pay Plus database of "Trendsetter" (without further specification as to Trendsetter Staffing or Trendsetter Leasing), so as to track commissions owed to Garry. Chad's deposition testimony was also cited in support of the summary-judgment ground that all of the former Worldwide accounts that Texas Staffing d/b/a Trendsetter Staffing bought under the Agreement were sold to SES, but that testimony *did not support that contention.* Likewise, Charles and Texas Staffing produced the 2001 asset purchase and sales agreement between SES and "Charles Joekel (the 'Company')," but the copy of that agreement does not list the assets sold.

■ Garry argues that a fact issue exists as to whether some of the accounts that Worldwide sold under the Agreement ended up in F.W. Services without compensation to him. We agree. The crux of the summary-judgment motion was that (1) all accounts that Worldwide sold under the Agreement ended up in Texas Staffing d/b/a Trendsetter Staffing; (2) no former Worldwide accounts ended up being transferred to F.W. Services; and (3) SES bought all accounts held in Texas Staffing d/b/a Trendsetter Staffing, including all of the former Worldwide accounts. As noted above, the summary-judgment evidence on which Charles and Texas Staffing relied to show (2) and (3) did not do so. Additionally, in his summary-judgment response, Garry provided the following evidence:

- Worldwide Temporary Services, a corporation that Garry eventually "roll[ed] up . . . into Westbury [World-wide Services, Inc.]," got into the skilled personnel business "sometime before [Garry] purchased it," which accounts Garry purchased.

- Garry's business at the time of the Agreement's execution was "the staff leasing business *and* skilled personnel business." (Emphasis added.)

- The Worldwide accounts sold under the Agreement were carried in "Trendsetter's" Pay Plus accounting program.

- The skilled-labor accounts were transferred to F.W. Services before the SES sale.

- Some of the same client names appeared both in a list of accounts receivable of the d/b/a's of F.W. Services from 1998 to 2001 and in the lists of accounts that Garry identified by deposition as having been sold by Worldwide under the Agreement.

Viewed in the required light, this evidence raises a fact issue as to whether (1) Worldwide sold skilled-labor accounts under the Agreement and (2) some of Worldwide's former accounts sold under the Agreement—skilled or otherwise—were transferred to F.W. Services, without payment to Garry, before the sale to SES. This is some evidence, then, of both breach and damages.

Garry also disputes the summary-judgment ground that the Agreement's provisions referring to "Trendsetter"—*e.g.,* "Joekel/ *Trendsetter* will take control of the Worldwide book of business" and "25% of the gross sales price received for [the sale of] *Trendsetter* " (emphasis added)— could have meant only Texas Staffing d/b/a Trendsetter Staffing.[7] Charles and Texas

---

7. Garry did not raise this argument in his summary-judgment response, but he may raise it now because it concerns whether

Charles and Texas Staffing's summary-judgment motion satisfied its burden on this

Staffing respond that the Agreement must be read with the Bill of Sale, which specified Texas Staffing d/b/a Trendsetter Staffing as the purchaser.

The Agreement used "Trendsetter" without specifying "Trendsetter Staffing" or "Trendsetter Skilled." Each of these was a d/b/a of a single corporation, Texas Staffing. A d/b/a ("doing business as") is not a separate corporate entity: rather, it is a name under which the corporation functions. *See Matice Enterps., Inc. v. Gibson*, No. 01–04–00913–CV, 2005 WL 1838018, at *5 (Tex.App.-Houston [1st Dist.] Aug. 4, 2005, no pet.) (mem. op.). Given this, the actual party to the Agreement was Texas Staffing. Both of Texas Staffing's d/b/a's used the term "Trendsetter"—meaning that the Agreement's plain language did not show that "Trendsetter" meant only Texas Staffing d/b/a Trendsetter Staffing. The Bill of Sale identifies Texas Staffing by its d/b/a Trendsetter Staffing, but again, the real party was Texas Staffing. Moreover, and importantly, the two contracts sold different things: the Bill of Sale sold physical assets and goodwill (*i.e.,* physical or intangible property other than client accounts), whereas the Agreement sold the book of business (*i.e.,* client accounts that, in theory, could have encompassed skilled-labor or staff-leasing accounts). Because the contractual term "book of business" could theoretically have included either type of client account,[8] and because the movants asserted that Texas Staffing d/b/a Trendsetter Staffing managed only staff-leasing accounts, it is reasonable to view the Agree-

ment's term "Trendsetter" as meaning more than simply d/b/a Trendsetter Staffing, despite the Bill of Sale's more limited designation. Accordingly, "Trendsetter" did not have to mean the same thing in the Agreement as it meant in the Bill of Sale.

We hold that Garry's evidence raised a genuine issue of material fact that precluded summary judgment on his breach-of-express-contract claim for remuneration for the pre-SES-sale transfer of former Worldwide accounts to F.W. Services. We sustain this challenge under Garry's sole issue.

## C. Garry's Standing to Sue on Any Claim and Charles's and Kenneth's Individual Liability on All Claims

In both the traditional and no-evidence portions of the defendants' summary-judgment motion, Charles and Kenneth urged that Garry lacked contractual privity, and thus standing, because Garry was not a party to the Agreement in his individual capacity and all of his claims arose out of the Agreement. In the traditional portion of the defendants' summary-judgment motion, Charles argued that the corporate veil protected him from individual liability on any claim because he signed the Agreement in his corporate capacity, not individually. Also in the traditional portion of the defendants' summary-judgment motion, Kenneth argued that the corporate veil protected him from all of Garry's claims because those claims related entirely to F.W. Services's actions. Finally, in

ground. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

**8.** This possibility is borne out by the parties' competing summary-judgment evidence: Garry's evidence showed that Worldwide's book of business included *both* staff-leasing *and* skilled-labor accounts; other evidence indicated that Worldwide had only staff-leasing

accounts to sell. For the reasons discussed earlier, we of course must take as true Garry's evidence that Worldwide transferred both kinds of accounts under the Agreement. For purposes of the current discussion, however, we note merely that the term "book of business" was not limited to a particular type of account.

the no-evidence portion of the defendants' summary-judgment motion, both Charles and Kenneth argued that no evidence raised a fact issue that they undertook the complained-of actions in their individual capacities.

### 1. Garry's Standing

Worldwide's accounts were corporate assets, not Garry's personal property. *Cf. Bilodeau v. Webb*, 170 S.W.3d 904, 912 (Tex.App.-Corpus Christi 2005, pet. denied) ("[A] cause of action for injury to the property of a corporation, or the impairment or destruction of its business, is vested in the corporation, as distinguished from its stockholders, even though it may result indirectly in the loss of earnings to the stockholders."). The Agreement implicitly recognizes this by acknowledging that the sale is "by [Worldwide] of its book of business...." Accordingly, when the Agreement recited that "GARRY PLOTKIN agrees to sell the book of business" of Worldwide, it was surely referring to him in the capacity of a corporate representative.

But this was not the only covenant in the Agreement in which Garry's name was used. Rather, there were two others. First, the Agreement provided that "GARRY PLOTKIN" or "PLOTKIN" would be paid either weekly commissions or, if "Trendsetter" was later sold during the Agreement's term, the lesser of a percentage of that sale or a fixed sum, less any commissions already paid. Second, the Agreement provided that "PLOTKIN" would assist after the sale when called upon in the maintenance of the sold accounts. The parties used Garry's name in these two covenants, not "Worldwide" or "Garry, on behalf of Worldwide."

The use of Garry's name in these two additional covenants renders unclear whether he held their rights and duties as an individual or as a corporate agent. For example, in the post-sale landscape in which these covenants came into play, Worldwide had already sold all of its assets to Texas Staffing and was no longer operating. Accordingly, the covenant that "PLOTKIN" would assist post-sale as requested could reasonably be interpreted to mean that Garry *individually* would assist. Likewise, it would not be unreasonable to read the covenant to pay "Garry Plotkin" commissions or a percentage of a later sale to mean payment to Garry individually: either as the sole director and officer of Worldwide or as its sole shareholder,[9] Garry could contract to have commissions or a percentage of any later sale paid to himself individually—regardless of any legal consequences that might result. And it was the 25%-sale-price covenant upon which Garry based his breach-of-contract claims.

Furthermore, the Agreement's introductory paragraph provided that "[t]he follow-

---

9. *See Speedy Stop Food Stores, Ltd. v. Reid Rd. Mun. Util. Dist. No. 2*, 282 S.W.3d 652, 656 n. 2 (Tex.App.-Houston [14th Dist.] 2009, pet. filed). ("It is well-established that corporations can act only through human agents and that, when an officer or corporate representative acts on behalf of a corporate entity, that act is the act of the corporation itself."); *see also Martin v. Martin, Martin & Richards, Inc.*, 12 S.W.3d 120, 124 (Tex.App.-Fort Worth 1999, no pet.) ("A sole shareholder or all shareholders acting in agreement, being all the beneficial owners of corporate proper- ty, may themselves deal with the [corporate] property [that they dispose of by contract], so long as the rights of creditors are not prejudiced. In such a case, only the corporation's creditors are in a position to complain of the lack of proper action by the board of directors.") (citing *Newman v. Toy*, 926 S.W.2d 629, 631 (Tex.App.-Austin 1996, writ denied)); *cf.* TEX. BUS. CORP. ACT ANN. art. 2.30–1(A)(6) (Vernon 2003) (shareholder agreements concerning corporate property); TEX. BUS. ORG. CODE ANN. § 21.101(a)(8) (Vernon 2008) (same).

ing represents *our* agreement regarding the sale by [Worldwide] of *its* book of sales to CHARLES L. JOEKEL." (Emphasis added.) The use of "our agreement" for the parties, in juxtaposition with the use of "its book of business" for the thing being sold, render unclear exactly who constituted "our" and for what covenants: Garry individually, Garry as corporate representative, Charles individually, or Charles as corporate representative. Finally, the signature blocks did not indicate if the parties signed individually, as corporate representatives, or in both capacities.

■ Charles and Texas Staffing point to the Bill of Sale—which Charles and Garry signed as corporate representatives and which was clearly between their two corporations—to eliminate any ambiguity in the Agreement. But the Bill of Sale concerned a one-time sale of totally different assets, with no continuing covenants. In contrast, the Agreement contained two covenants that the parties intended to extend beyond the sale date during a time in which Worldwide no longer functioned. Although "all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another," the Texas Supreme Court has "cautioned ... that this rule is simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily." *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex.1999). We thus do not blindly apply the rule when, as here, the two contracts'

provisions differ in material respects. *See id.*

■ We hold that the Agreement is ambiguous as to whether the referenced rights and obligations were given to Garry in his individual or his corporate capacity.[10] Accordingly, the trial court erred in rendering summary judgment on the ground that Garry lacked standing or privity. *See Coker*, 650 S.W.2d at 394 ("When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue."). We sustain this challenge under Garry's sole issue.

### 2. Charles's Individual Liability

The sole summary-judgment grounds attacking Garry's ability to sue Charles individually were that (1) Charles was not a party to the Agreement in his individual capacity, but only as representative for Texas Staffing; (2) Garry could produce "no evidence of at least one element required to pierce the corporate veil"; and (3) all of Garry's claims arose out of the Agreement.

■ We hold that the Agreement is ambiguous as to whether Charles signed the Agreement in his individual capacity, his corporate capacity, or both, depending on the obligation. For example, the Agreement provided that "CHARLES L. JOEKEL" would buy the book of business; that "JOEKEL" would pay "PLOTKIN" commissions; and that if "JOEKEL" sold "Trendsetter" during the Agreement's term, "JOEKEL" would pay either a per-

---

**10.** Charles and Texas Staffing argue that Garry cannot assert now that the Agreement is ambiguous because he never pleaded ambiguity below. However, even when both parties agree that their contract is unambiguous and merely disagree as to its unambiguous meaning, a court may independently conclude that the contract is ambiguous. *See White v. Moore*, 760 S.W.2d 242, 243 (Tex.1988); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983). Thus, in an appeal from a summary-judgment ruling, "[a] court may conclude that a contract is ambiguous even in the absence of such a pleading by either party." *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex.1993).

centage of the sale or a fixed sum, less previously paid commissions. In contrast, the Agreement elsewhere provided that "JOEKEL/Trendsetter" would take control of the book of business and that "PLOTKIN" would assist "JOEKEL/Trendsetter" as they requested with the maintenance of former Worldwide accounts. Again, the signature blocks did not indicate if the parties signed individually, as corporate representatives, or in both capacities. And as we discussed above in the context of Garry's standing, the Bill of Sale's language does not render the meaning of "JOEKEL," "CHARLES L. JOEKEL," or "JOEKEL/Trendsetter" unambiguous.

For these reasons, we hold that the Agreement is ambiguous as to whether Charles was signing as Texas Staffing's representative or individually. Because of this, it is irrelevant whether Garry produced some evidence to pierce Texas Staffing's corporate veil. Accordingly, the trial court erred in rendering summary judgment on the ground that Charles could not be sued in his individual capacity. *See Coker*, 650 S.W.2d at 394. We sustain this challenge under Garry's sole issue.

### 3. Kenneth's Individual Liability

Kenneth's summary-judgment motion asserted that, because all of Garry's claims related to the acts of his corporation, F.W. Services, Kenneth could not be held individually liable; the no-evidence portion of his motion asserted that Garry could produce no evidence entitling him to pierce the corporate veil. The argument in Garry's relevant appellate briefing concerns only Charles and the capacity in which Garry and Charles signed the Agreement. Kenneth was not a party to the Agreement. Garry does not discuss Kenneth's individual liability, and we can discern no

attack of Kenneth's summary-judgment ground that he could not be individually liable. Accordingly, we affirm the summary judgment rendered on all of Garry's claims alleged against Kenneth in his individual capacity. *See Tricon*, 226 S.W.3d at 500.

### D. Implied–In–Fact and Quasi Contract Claims Against F.W. Services [11]

Garry's pleading did not employ the term "implied-in-fact contract," but he now takes the position that he pleaded such a claim. Garry expressly pleaded that an "implied contract in law," *i.e.,* a quasi contract, arose between him and F.W. Services because the latter knew that the accounts that Charles transferred to it contained former Worldwide accounts, resulting in a fraudulent conveyance that unjustly enriched F.W. Services.

### 1. Implied–in–Fact Contract

Garry first argues that the trial court erred in rendering summary judgment on his implied-in-fact breach-of-contract claim.

"The elements of a contract, express or implied, are identical." *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex.App.-San Antonio 1989, no writ). Accordingly, the elements of either type of contract are "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *DeClaire v. G & B McIntosh Family Ltd. P'Ship*, 260 S.W.3d 34, 44 (Tex.App.-Houston [1st Dist.] 2008, no pet.). "[T]he real difference between express contracts and those implied in fact

11. Garry pleaded this claim against Kenneth, too, but, as explained above, the summary judgment disposing of his individual liability must be affirmed.

is in the character and manner of proof required to establish them." *Haws & Garrett Gen. Contractors., Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex.1972). "In each instance there must be shown the element of mutual agreement which, in the case of an implied contract, is inferred from the circumstances." *Id.*

Garry's pleading expressly referred only to a "contract implied in law" (*i.e.*, a quasi contract), not an implied-in-fact one. The supporting allegations were not entirely clear as to which type of implied contract Garry meant. Rather than specially excepting for clarification, F.W. Services construed Garry's allegations to include breach of an implied-in-fact contract and moved for no-evidence summary judgment on that claim, raising these grounds:

1. No evidence demonstrated that F.W. Services and Garry had a meeting of the minds.

2. No evidence existed that F.W. Services consented to be bound.

3. No evidence existed that Garry tendered performance or provided goods and services.

4. No evidence of privity existed between Garry and F.W. Services for various reasons.

■■■■■ Garry's summary-judgment response addressed the fourth summary-judgment ground—privity—by urging that he was in privity with F.W. Services because it had "received accounts conveyed by Garry ... to Charles ... and did not pay [Garry] either commissions owed ...,, or the value of the business which was conveyed ...," so that Garry "was clearly in privity with [F.W. Services] with respect to funds due and owing [Garry] under the terms of [the Agreement]." He did not address any of the first three grounds, however, and his response did not point to evidence raising a fact issue on the challenged elements.[12] A trial court must grant a no-evidence summary-judgment motion if the non-movant does not produce evidence raising a fact issue on a challenged element. *See* TEX.R. CIV. P. 166a(i). Accordingly, we hold that the trial court did not err in rendering summary judgment on any implied-in-fact breach-of-contract claim that Garry might have alleged.

**12.** On appeal, Garry cites evidence from his summary-judgment response that he argues raised a fact issue on the challenged implied-in-fact contract element of mutual consent. Specifically, he argues that evidence that he produced showing that Charles was the Chairman of the Board of F.W. Services indicates that he "had the authority to bind F.W. Services to a contract" and that his knowledge thus "is imputable to F.W. Services." However, Garry's summary-judgment response did not bring to the trial court's attention either this evidence or this argument, as was his burden. *See Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 309 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (indicating that non-movant's burden is to point out evidence raising a fact issue); *Springer v. Am. Zurich Ins. Co.*, 115 S.W.3d 582, 585 (Tex.App.-Waco 2003, pet. denied) ("If it is [the non-movant's] assertion that the Commission decision constitutes evidence that would defeat the no-

evidence motion for summary judgment, it was her responsibility to present such an assertion to the trial court through her response."). The only place in his response that Garry relied on this particular evidence was in response to an unrelated summary-judgment ground that did not concern Charles's authority to bind F.W. Services. Accordingly, we may not consider Garry's argument on appeal. *See Holloway v. Tex. Elec. Util. Constr., Ltd.*, 282 S.W.3d 207, 212 (Tex. App.-Tyler 2009, no pet.) (holding that no-evidence summary-judgment response was inadequate to raise fact issue when party failed to discuss challenged element anywhere in response). *Compare Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207–08 (Tex. 2002) (concluding that non-movant's response was adequate despite not expressly discussing challenged claim because, under other portions of response, party referred briefly to it and discussed pertinent evidence).

We overrule this challenge under Garry's sole issue.

### 2. Quasi Contract

In support of his quasi contract claim against Kenneth and F.W. Services, Garry alleged that these defendants were "beneficiaries of the monies and accounts conveyed by [Garry] to [Charles and Texas Staffing]"; that they "used those assets for their own benefit sans any compensation" to Garry; that the claim was also based on Kenneth's "position in privity with [Charles's] business, as well as [Kenneth's and F.W. Services's] knowledge of the terms reflected in the [Agreement] prior to the fraudulent transfer of [Garry's] accounts from Charles ... to Kenneth"; and that Garry sought "damages he sustained"[13] from the "fraudulent conveyance" of "funds and accounts had and received" by Kenneth and F.W. Services.

 " 'Contracts implied in law, or ... more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice....' " *Ferrous Prod. Co. v. Gulf States Trading Co.*, 160 Tex. 399, 402–03, 332 S.W.2d 310, 312 (1960) (quoting ARTHUR L. CORBIN, CORBIN ON CONTRACTS and C.J.S., *Contracts* ). " 'Such contracts rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do....' " *Id.* F.W. Services's no-evidence summary-judgment motion asserted that Garry "failed to present any admissible evidence that a contract implied in law [*i.e.*, a quasi contract] was created."

 Garry's petition alleged that the equity to be served by restitution damages was remedying the fraudulent conveyance of former Worldwide accounts to Kenneth with Kenneth's knowledge. That is, Garry alleged that Kenneth's and F.W. Services's wrongful conduct underlay this claim. However, in seeking to substantiate this allegations, Garry pointed only to the Agreement and the list of accounts receivable of the d/b/a's of F.W. Services, which contained some of the accounts that Garry identified as former Worldwide accounts. Garry did not identify any evidence in support of this quasi contract claim that anything akin to a fraudulent transfer to Kenneth had occurred with Kenneth's knowledge or that Kenneth had otherwise intentionally taken advantage of him— which was the basis that Garry had alleged justified the imposition of a quasi contract.[14]

Given the state of Garry's allegations and evidence tendered in support, we hold that the trial court did not err in rendering summary judgment on that claim. We overrule this challenge under Garry's sole issue.

### E. Breach of Fiduciary Duty

Garry pleaded a breach-of-fiduciary-duty claim against Charles and Texas Staffing, referencing Garry and Charles's verbal agreement to hold Garry's commissions "in trust," which "Charles Joekel converted ... for his own use and benefit without [Garry's] knowledge and consent."

---

13. He also sought disgorgement of profits and other remedies that he has abandoned on appeal.

14. In fact, Garry did not respond to the summary-judgment motion's challenge to his claims for common-law and statutory fraud arising out of the intentional transfer of former Worldwide assets to Kenneth and F.W. Services, and he has abandoned these claims on appeal.

■ The elements of a breach-of-fiduciary-duty claim are (1) the existence of a fiduciary relationship between the plaintiff and defendant; (2) the defendant's breach of the fiduciary duties arising from that relationship; and (3) injury to the plaintiff, or benefit to the defendant, resulting from that breach. *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex.App.-Dallas 2006, pet. denied). The no-evidence portion of Charles and Texas Staffing's summary-judgment motion attacked all elements of the claim.

■ Garry's claim rested not on a formal fiduciary relationship, but on an informal one. "An informal fiduciary duty may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship." *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex.1998). This duty is not lightly created, however. *Id.* at 288. "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Id.* "[M]ere subjective trust does not . . . transform arm's-length dealing into fiduciary relationship." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex.1997). "Although . . . the existence of a confidential relationship is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex.1992).

■ The only basis that Garry asserted for a fiduciary duty was the oral agreement to hold his commissions in trust.[15] The commissions were part of an arms-length, express contract between Garry and Charles or Texas Staffing. This agreement is simply not the type that will give rise to a fiduciary duty. Garry relied below on no evidence of a fiduciary relationship that existed prior to or apart from the verbal agreement to hold commissions. *See id.* The trial court thus did not err in rendering summary judgment on Garry's breach-of-fiduciary-duty claim.

We overrule this challenge under Garry's sole issue.

## Charles and Texas Staffing's and Kenneth and F.W. Services's Appeals

### A. Bases for Judgment Not Challenged on Appeal

Charles and Texas Staffing counterclaimed against Garry for breach of the Agreement's requirement that he assist after the sale in the maintenance of the former Worldwide accounts upon request. Garry moved for no-evidence summary judgment on this claim. Charles and Texas Staffing do not challenge the summary-judgment rendered on this claim. Accordingly, we must affirm that portion of the judgment. *See Tricon Tool & Supply, Inc.*, 226 S.W.3d at 500.

Garry, Chad, and Chad's three corporations also moved for no-evidence summary

---

15. On appeal, Garry also asserts that a fiduciary duty arose due to his and Charles's being "long standing family friends," their having "repeated business contacts," and their "often work[ing] together." However, we do not read Garry's petition as alleging these bases for a fiduciary duty. And even if it did, Charles and Texas Staffing moved for no-evidence summary judgment on the basis that no fiduciary relationship existed; Garry neither argued that their friendship or past business relationship created a duty nor pointed out evidence in support; and Garry's response instead referenced the oral agreement for Charles to hold Garry's commissions. Accordingly, Garry cannot now rely on the parties' friendship and lengthy business contacts as bases for reversal. *See* Tex.R. Civ. P. 166a(i) & cmt.

judgment on the claim for attorney's fees of Kenneth and F.W. Services. Kenneth and F.W. Services did not respond to that ground below, and they do not challenge on appeal the rendition of judgment on their fee request. Accordingly, we must affirm this portion of the summary judgment, as well. *See id.*

Finally, Kenneth and F.W. Services do not complain on appeal of the rendition of summary judgment on their claims that Garry, Chad, and Chad's three corporations tortiously interfered with (1) an agreed temporary injunction between Cary and F.W. Services and (2) unspecified "existing labor staffing contracts in the San Antonio and Houston markets" other than their non-competition agreement with Cary. Accordingly, we must also affirm the judgment rendered on these tortious interference claims. *See id.*

## B. Charles and Texas Staffings's Fraud Counterclaims Against Garry

In issue five, Charles and Texas Staffing contend that the trial court erred in rendering summary judgment on their fraud counterclaims against Garry. *See Sears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex.1994) (" 'The elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.' ") (quoting *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990)).

 In their counter-petition, Charles and Texas Staffing alleged that Garry had committed fraud by (1) misrepresenting

that Worldwide's book of business was worth $30 million per year and (2) misrepresenting that he would continue to assist in the maintenance of the former Worldwide accounts upon request. Garry moved for no-evidence summary judgment on each element of these fraud claims. In their summary-judgment response, Charles and Texas Staffing did not identify any evidence to show the falsity of Garry's representations concerning the value of Worldwide's accounts or of his agreement to assist with these accounts' maintenance in future—the sole factual bases for their claims. Rather, their response focused solely on Garry's alleged forgery, following the Agreement's execution, of an "Exhibit A" to the Agreement, in which Garry listed former Worldwide accounts on which the parties had purportedly agreed that he would receive commissions. Charles and Texas Staffing's appellate challenges also focus on Exhibit A.

Charles and Texas Staffing's summary-judgment evidence was not relevant to the fraud allegations set forth in their pleadings and on which Garry moved for summary judgment. Accordingly, the trial court did not err in rendering summary judgment on Charles and Texas Staffing's fraud claims against Garry.

When Charles and Texas Staffing raised a new basis for their fraud claim in their summary-judgment response, Garry did not object, but neither did he join the issue by reply. Even if the new fraud allegation could be viewed as having been tried by consent,[16] Charles and Texas Staffing did not point out evidence concerning the fraud elements of reliance and damages arising from the alleged fabrication of Ex-

---

16. *See Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 313 (Tex.2006) ("When [the plaintiff-nonmovant] asserted the discovery rule for the first time in its summary judgment response, [the defendant-movant] had two choices: it could object that the discovery rule had not been pleaded, or it could respond on the merits and try the issue by consent.").

hibit A. *See Meadows,* 877 S.W.2d at 282. A trial court must grant a no-evidence summary judgment on a claim if the non-movant does not produce any evidence of the challenged elements of that claim. *See* Tex.R. Civ. P. 166a(i).

We overrule issue five.

## C. Kenneth and F.W. Services's Fraud Counterclaim Against Garry

In issue four, Kenneth and F.W. Services contend that the trial court erred in granting Garry's no-evidence summary-judgment motion on their fraud counterclaim against Garry.

Kenneth and F.W. Services alleged that Garry

> made false, material representations to [them] regarding his loyalty and ability to maintain the confidentiality of all records, plans and information he acquired through his relationship with ˙ [them]. [Garry] falsely represented to [them] that as confidant and close business associate, he would not do anything detrimental to the business success of [them]. [Garry] further falsely represented that he did not have any continuing relationship with Diamond, Cary or Murphy after they left their employment with F.W. Services, Inc.

Garry's no-evidence summary-judgment motion challenged all elements of this fraud counterclaim.

■ Although Kenneth and F.W. Services' summary-judgment response alleged that Garry had made representations that he was reliable and would not use F.W. Service's confidential financial information, they pointed to no summary-judgment evidence to support this allegation. For example, their response to the motion's attack on the fraud counterclaim pointed to only two pieces of evidence: (1) some of CJP Financial's corporate records from

the Texas Secretary of State and (2) Diamond's deposition, which contained no testimony about the alleged representations. Because Kenneth and F.W. Services failed to carry their burden of producing some evidence to support this element of their fraud counterclaim against Garry, we hold that the trial court did not err in rendering summary judgment on it. *See* Tex.R. Civ. P. 166a(i); *Meadows,* 877 S.W.2d at 282.

We overrule issue four.

## D. Charles and Texas Staffing's and Kenneth and F.W. Services's Counterclaims Against Garry for Breach of Fiduciary Duty

In issue six, Charles and Texas Staffing argue that the trial court erred in granting Garry's no-evidence summary-judgment motion on their counterclaim for breach of fiduciary duty against Garry. In issue three, Kenneth and F.W. Services argue that the trial court erred in granting Garry's no-evidence summary-judgment motion on their counterclaim for breach of fiduciary duty against Garry.

### 1. The Allegations

Kenneth and F.W. Services alleged that Garry had a "special relationship of trust and confidence" with them, which he had breached by "conspiring to establish competing businesses," and which had damaged them in unspecified ways. Charles and Texas Staffing alleged that Garry's breach of his fiduciary relationship to them had resulted in damages, which included his owing them for 10 years of rent, utilities, and other operating expenses. Charles and Texas Staffing further alleged that Charles "conveyed and required [what became Worldwide's] business with the express and implied understanding that [Garry] would continue to honor his commitments to [Charles] of good faith and fair dealing." The relevant underlying

facts that both petitions alleged were that (1) Garry ran Worldwide from their offices without paying overhead or expenses; (2) Garry had unlimited access to their business plans, trade secrets, files, business records, contracts, and computers; (3) he worked in close proximity to their employees; and (4) they trusted him.

### 2. The Law

Again, the elements of a breach-of-fiduciary-duty claim are (1) the existence of a fiduciary relationship between the plaintiff and defendant; (2) the defendant's breach of the fiduciary duties arising from that relationship; and (3) injury to the plaintiff, or benefit to the defendant, resulting from that breach. *Jones,* 196 S.W.3d at 447. "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit," and mere subjective trust is not enough. *Assoc. Indem. Corp.,* 964 S.W.2d at 288; *Swanson,* 959 S.W.2d at 177.

### 3. The Motions and Responsive Evidence

Garry's no-evidence summary-judgment motion challenged each element of Charles and Texas Staffings's and Kenneth and F.W. Services's breach-of-fiduciary-duty counterclaims against him. We need to consider only the element of the existence of a fiduciary relationship.

■ It was undisputed that Garry was not F.W. Services's employee or representative and that he had his own staffing business during the time that he shared offices with F.W. Services. In their respective responses, Charles, Texas Staffing, Kenneth, and F.W. Services argued that a fiduciary relationship arose from Charles' long-term friendship with Garry, Charles' and Kenneth's having allowed Garry to share F.W. Services's office for eight years, their having given Garry complete access to F.W. Services's business records, and their trust and reliance on him. By reply brief, however, they expressly disavow reliance on the parties' long-time friendship and their sharing of office space, arguing instead that the fiduciary relationship arose by virtue of their having "entrusted Garry with confidential information." Looking only to this basis, we consider the evidence that Charles, Texas Staffing, Kenneth, and F.W. Services tendered below in support:

- While Garry shared offices with them, he had "complete access to [Kenneth's] entire business," including "staff, records, everything."

- "We trusted [Garry] 100 percent," believing that he "was essentially a family member . . . ."

- "When F.W. Services was preparing to relocate [to a new location], Garry . . . offered to personally take responsibility for transporting F.W. Services's corporate records," an offer that Charles and Kenneth accepted because they "trusted him as though he were part of the family."

An informal fiduciary duty is not lightly recognized. *See Assoc. Indem. Corp.,* 964 S.W.2d at 288. The record shows that Garry, Charles, and Kenneth were experienced business people, that each had his own business, and that none was a co-employee or representative of any common business. Their mere access to each others' business records and information while office-sharing does not convert their standard business relationship into one of the highest fiduciary stature, in which each party would have to place the other's interests before his own. This is especially true here, where each party independently operated a separate staff-leasing or payrolling business during the period of office-sharing. We have found no authority

recognizing an informal fiduciary relationship on evidence like this, and Charles, Kenneth, and their businesses point us to none. Finally, the above evidence, which appellants concede is the sole basis for the relationship underlying this claim, shows Garry's access *to F.W. Services's* business records; it does not show that Garry had access to *Texas Staffing's* business records, and it is no evidence of a fiduciary relationship between Garry, on the one hand, and Charles and Kenneth individually, on the other.

On appeal, Charles, Texas Staffing, Kenneth, and F.W. Services also argue that they raised a fact issue on an alternative breach-of-fiduciary-duty theory: that Garry was liable for inducing Cary to breach Cary's fiduciary duty to F.W. Services. This theory was not pleaded as a basis for any defendant's breach-of-fiduciary-duty claim against Garry, however. Kenneth and F.W. Services did raise this theory in one sentence of their summary-judgment response. But even if their doing so could somehow render the theory tried by consent, when Garry did not join the issue by reply,[17] we would overrule the challenge. Kenneth and F.W. Services pointed to no evidence in support of that theory below, including anything showing that any fiduciary duty that Cary owed to F.W. Services during his employment with it extended beyond his employment term, which is the point at which he allegedly began competing in violation of his non-competition agreement. *See* TEX.R. CIV. P. 166a(i).

We hold that the trial court properly rendered summary judgment on the breach-of-fiduciary-duty claims of Charles, Texas Staffing, Kenneth, and F.W. Services against Garry. We overrule issues three and six.

**E. Kenneth and F.W. Services's Counterclaims Against Garry, and Their Third–Party Claims Against Chad and Chad's Three Corporations, for Conspiracy and Tortious Interference With an Existing Contract and With Prospective Business Relations**

Third-party plaintiffs and counter-defendants Kenneth and F.W. Services alleged that counter-defendant Garry and third-party defendants Chad, CJP Financial, CJP Resources, and Your Recruiters had tortiously interfered with F.W. Services's existing non-competition agreement with Cary and that, through promoting Cary's competition, they had also tortiously interfered with F.W. Services's prospective business relations.

Kenneth and F.W. Services also alleged that Garry, Chad, and Chad's three corporations had conspired "to destroy [their] business ... by setting up a factoring business, in order to aid, assist, and financially support competing businesses"; to induce F.W. Service's employees to use its confidential information to compete with it; and to induce Cary to violate his non-competition agreement with F.W. Services.

Garry moved for no-evidence summary judgment on these counterclaims. Chad and his three corporations moved for traditional and no-evidence summary judgment on these third-party claims.

---

17. *See Via Net,* 211 S.W.3d at 313 ("When [the plaintiff-nonmovant] asserted the discovery rule for the first time in its summary judgment response, [the defendant-movant] had two choices: it could object that the discovery rule had not been pleaded, *or it could respond on the merits and try the issue by consent.*") (emphasis added). We note that even if this theory could be considered tried by consent for Kenneth and F.W. Services, it could not for Charles and Texas Staffing, who did not assert it in their summary-judgment response.

### 1. The No–Evidence Summary–Judgment Motions of Garry and of Chad and His Three Corporations

#### a. Tortious interference with existing contract

In part of issue one, Kenneth and F.W. Services assert that the trial court erred in granting the no-evidence summary-judgment motions of Garry, Chad, and Chad's three corporations on their counterclaim and third-party claim for tortious interference with an existing contract.

 The elements of tortious interference with an existing contract are that (1) the plaintiff had a contract subject to interference, (2) the defendant willfully and intentionally interfered with that contract, (3) the interference proximately caused the plaintiff's damage, and (4) the plaintiff incurred actual damage or loss. *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 790 (Tex.App.-Houston [1st Dist.] 2004, no pet.). The no-evidence summary-judgment motions of Garry and of Chad and his three corporations challenged each element of this claim.

In response, Kenneth and F.W. Services produced the following evidence:

- that after Cary left F.W. Services, Huntington—a company owned by Garry's brother—serviced 80% to 85% of the factoring needs for Cary's new staffing business, Opcion Uno, L.L.C., which operated in San Antonio;

- that Huntington was in place as a funding source before Cary left F.W. Services;

- that Garry had referred Cary to Huntington for financing and had assured Cary prior to Cary's leaving F.W. Services that Huntington could provide him funding;

- that Cary mainly talked to and dealt with Garry about matters related to Huntington, even though Garry's brother owned the company;

- that it was important for Cary to have adequate financing to start his business;

- that before he left F.W. Services in May 2002, Cary spoke with Garry at least once about the ins and outs of starting his own business;

- that Cary had a non-competition agreement with F.W. Services, which precluded his competing with F.W. Services within a 50–mile radius of any city in which the company conducted its business;

- that Cary told Garry that he had this non-competition agreement with F.W. Services, that he told Garry about his idea to open a business in San Antonio so as not to violate that agreement, and that Cary believed that Garry "thought that [Cary's] thought process was sound";

- that "Pacesetter Personnel" operated in San Antonio; [18]

18. Cary testified that he had done "some work on behalf of [Kenneth] for the benefit of his San Antonio entity," San Antonio Staffing, before he had left F.W. Services, but that San Antonio Staffing "fell under a different corporate umbrella than what [he] was competing against." Kenneth's summary-judgment affidavit did not explain the relationship, if any, between San Antonio Staffing and F.W. Services. However, Kenneth and F.W. Services also produced Diamond's deposition testimony, in which she testified that in 1987 she had been "transferred by Charles Joekel" to San Antonio, where *she worked for both "Pacesetter Personnel"* and for San Antonio Staffing. In that same testimony, she also responded affirmatively to a question asking whether Garry had suggested to her, before she left F.W. Services in 1996, that she "should leave and set up *a competing business with Pacesetter in San Antonio.*" (Emphasis added.) This is some evidence, when viewed in the light most favorable to Kenneth and F.W. Services, that F.W. Services d/b/a Pacesetter Personnel

- that Cary had been a key employee of F.W. Services; and
- that F.W. Services spent eight months . locating and training a replacement for Cary, who until he had left had been the only employee trained to train new sales people.

■ We first hold that Kenneth and F.W. Services produced some evidence of each element of this claim against Garry, including evidence showing Garry's knowledge of the non-competition agreement's existence; his assistance in obtaining, and in continuing to be a contact for, Huntington's factoring of Cary's San Antonio business, which was necessary to the running of that business; F.W. Services d/b/a Pacesetter Personnel's operating in San Antonio to some extent; and F.W. Services's having had to locate and to train Cary's replacement over an eight-month period, when Garry had been the only employee trained to train new sales people.

■ We also hold, however, that Kenneth and F.W. Services did not carry their burden of producing some evidence of each element of this claim against Chad or his three corporations. Kenneth and F.W. Services' brief asserts that "Chad . . . solicited his father's and Huntington's help in tortiously interfering with the Cary/Pacesetter employment contact"; that "Chad . . . permitted this arrangement [for Huntington's factoring of Cary's business] to take place"; and that "even though Chad was aware of the non-compete provision, he intentionally encouraged Cary to violate his agreement and assisted him in his endeavor by facilitating discussions between his father and Cary." But the summary-judgment evidence, even when viewed in the light most favorable to Kenneth and F.W. Services, shows none of these things.[19] Rather, the cited evidence shows only that Chad and Cary had been close friends since college, that Cary had mentioned to Chad that he was thinking about starting a business in San Antonio, and that Cary told Chad at some unspecified point that he was receiving factoring from Huntington, although Chad did not recall Cary's mentioning that fact to him at the time that Cary was first going into business. No cited evidence indicates that Chad knew of the non-competition agreement, that Chad facilitated any discussions between Garry or Huntington and Cary, or that Chad or his companies encouraged or assisted Cary in violating his non-competition agreement. Kenneth and F.W. Services ask us to infer from Chad and Cary's close friendship and *Garry's* knowledge of the non-competition agreement that Chad also knew of the agreement, but that would require crediting speculation as evidence and stacking inference upon inference, neither of which we may do. *See Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727–28 (Tex.2003).

We address one final matter raised by Garry, Chad, and Chad's three corporations on appeal. They contend that the

conducted business, through San Antonio Staffing or otherwise, in San Antonio.

19. Kenneth and F.W. Services argue that Chad and his three corporations can be held liable for the actions of Huntington under the single-business-enterprise theory. They did not allege this liability basis in their counterpetition, but did raise it—without objection, but also without joinder by the movants—in their summary-judgment response. Assuming without deciding that this liability theory could be viewed as having been tried by consent, *see Via Net,* 211 S.W.3d at 313, the Texas Supreme Court has since rejected its validity. *See SSP Partners v. Gladstrong Investments (USA) Corp.,* 275 S.W.3d 444, 456 (Tex.2008). Accordingly, the evidence that Kenneth and F.W. Services produced in support of this responsive theory did not constitute any evidence of Chad's or his corporations' acts.

non-competition agreement was not part of the summary-judgment evidence because it, along with other evidence, was struck upon their objections. However, the order granting their objections and striking the non-competition agreement was signed more than two months after the trial court had already rendered summary judgment, at the time of the denial of Garry's simultaneously filed motion for new trial. Although the belated order recited that the exhibits were struck from Kenneth and F.W. Services's summary-judgment response, nothing in the final summary judgment itself indicates that the trial court considered the objections when it ruled on the summary-judgment motion. For example, the judgment recited that the court had considered "the evidence," without restriction, and did not mention the evidentiary objections. Additionally, Garry's motion for new trial, in which he asked for a ruling on his prior objections, noted that "the Court *did not rule upon* [Garry's] objections to Defendants' summary judgment exhibits" and thus requested a "specific written ruling on each objection" for "purposes of preserving the appellate record" because "failure to get written rulings waives the objections on appeal ..., a waiver which Plaintiff declines." (Emphasis added.)

██ Given this record and these circumstances, it is not entirely clear that the trial court's signing the order striking this evidence two and a half months after its summary-judgment ruling, in conjunction with its consideration of a motion for new trial, demonstrated that the court did not consider the disputed evidence at the time of its summary-judgment ruling. The ambiguity in this case distinguishes it from those in which the record more clearly demonstrated that a belated written ruling on evidentiary objections memorialized an unwritten ruling made at the time of summary judgment.[20] As with any ruling, a summary-judgment order's review generally extends to the evidence that was before the court when it ruled, absent an indication that the court did not consider certain evidence for purposes of that ruling. *See Methodist Hosps. of Dallas v. Tall,* 972 S.W.2d 894, 898 (Tex.App.-Corpus Christi 1998, no pet.) ("It is axiomatic that an appellate court reviews actions of a trial court based on the materials before the trial court at the time it acted.") Accordingly, we cannot say with certainty that the trial court did not consider the non-competition agreement when it rendered summary judgment.

We sustain the portion of issue one that complains of the judgment rendered on the claim against Garry for tortious interference with Cary's non-competition agreement with F.W. Services. We overrule the portion of issue one that complains of the judgment rendered on the claim against Chad and his three corporations for tortious interference with Cary's non-competition agreement with F.W. Services.

20. *See Esty v. Beal Bank S.S.B.,* 298 S.W.3d 280, 294–95 (Tex.App.-Dallas 2009, no pet. h.) (holding that challenge to trial court's having signed orders striking summary-judgment evidence after denial of motion for new trial was waived because both parties had agreed that trial court could wait to rule on objections until after summary-judgment ruling and because trial court had earlier signed another post-judgment order expressly stating that it had considered, at time that it had ruled on summary-judgment motion, only competent and admissible evidence); *Crocker v. Paulyne's Nursing Home, Inc.,* 95 S.W.3d 416, 420 (Tex.App.-Dallas 2002, no pet.) (holding that order sustaining evidentiary objections signed 89 days after summary-judgment ruling was effective to memorialize evidentiary ruling made before summary-judgment order's signing, that court had considered "evidence admitted for consideration" and parties' objections).

### b. Tortious interference with prospective business relationships

In the remainder of issue one, Kenneth and F.W. Services assert that the trial court erred in granting the no-evidence summary-judgment motions of Garry, Chad, and Chad's three corporations on their counterclaim and third-party claim for tortious interference with prospective business relationships. As they did with their claim for tortious interference with an existing contract, Kenneth and F.W. Services clarify on appeal that the focus of this claim is on the alleged recruitment of and assistance to Cary in his starting a competing business in San Antonio.

■ "To establish a cause of action for tortious interference with prospective business relationships, a plaintiff must show that (1) there was a reasonable probability that the parties would have entered into a business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Richardson–Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). The motions of Garry and Chad and his three corporations challenged each element of this claim.

■ The sole evidence that Kenneth and F.W. Services's response pointed out to show elements (1) and (4) was Kenneth's affidavit, in which he averred that "F.W. Services suffered further lost profits" from Cary's competing against it because "it is reasonably likely that some of the unskilled work Cary obtained for his own business would have been obtained for F.W. Services had Cary remained." This assertion is conclusory and cannot raise a fact issue on summary judgment. *See Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex.1996) ("Conclusory affidavits are not enough to raise fact issues" in that "[t]hey are not credible, nor [are they] susceptible to being readily controverted"). The conclusory nature of this evidence distinguishes it from the evidence in *Bradford v. Vento*, on which Kenneth and F.W. Services rely: here, there is no evidence as to the type of clients (skilled or not) F.W. Services serviced in San Antonio, the number of its San Antonio customers, or like matters that would have shown a reasonable probability that the clients that Cary serviced there would have contracted with F.W. Services if Cary had not operated there. *Compare id.*, 997 S.W.2d 713, 732 (Tex.App.-Corpus Christi 1999) (holding that legally and factually sufficient evidence of first element of tortious-interference-with-prospective-business-relations claim existed when plaintiff, who alleged that he had lost customers due to defendant's interference, produced evidence that plaintiff had considerable experience in selling product, a large collection of merchandise, an established and expanding customer base, and a certain volume of customer sales), *rev'd in part on other grounds*, 48 S.W.3d 749 (Tex.2001).

Additionally, as discussed with respect to the third-party claim against Chad and his corporations for tortious interference with an existing contract, there is no evidence that Chad or his corporations, which did not provide factoring services to Cary, tortiously interfered with anything.

We overrule the remainder of issue one that complains of the judgment rendered on the claim against Garry, Chad, and Chad's three corporations for tortious in-

terference with prospective business relations.

#### c. Civil conspiracy

In issue two, Kenneth and F.W. Services argue that the trial court erred in granting the no-evidence summary-judgment motions of Garry, Chad, and Chad's three corporations on their counterclaim and third-party claim for civil conspiracy.

Kenneth and F.W. Services's petition alleged that Garry, Chad, and Chad's three corporations had conspired "to destroy [their] business ... by setting up a factoring business, in order to aid, assist, and financially support competing businesses"; to induce F.W. Service's employees to use its confidential information to compete with it; and to induce Cary to breach his non-competition agreement with F.W. Services. As they did with their tortious interference claims, Kenneth and F.W. Services clarify on appeal that their conspiracy claim arises from "the enticement of ... Cary to breach his employment agreement and set up a competitive business."

■ The elements of civil conspiracy are (1) two or more people; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex.2005). The movants challenged all elements of this claim.

■ First, for the same reasons as discussed above with regard to the tortious interference claims, Kenneth and F.W. Services did not raise a fact issue on element (2) of their conspiracy claim against Chad and his three corporations. In fact, the only appellate argument concerning the allegations against Chad and his corporations is a conclusory statement that

"Chad and Garry Plotkin entered into a conspiracy to destroy [Kenneth and F.W. Services] and steal away Pacesetter's top employees" and an assertion that "Chad, as sole officer and director or CJP Financial, allowed his father to use his company to perpetuate this conspiracy." The evidence, however, showed that Huntington, not Chad or his corporations, financed Cary's San Antonio business, not that Chad "allowed" Garry to do anything related to Cary or that Garry had used Chad's corporations to service Cary's business. Accordingly, we hold that the trial court did not err in granting the no-evidence summary-judgment motion on Kenneth and F.W. Services's conspiracy claim against Chad and his corporations.

Kenneth and F.W. Services's counter-petition alleged that Garry, Chad, and Chad's three corporations were the coconspirators. We have already held that Kenneth and F.W. Services produced no evidence that Chad or his corporations were part of a conspiracy concerning Cary and his San Antonio business. There cannot be a conspiracy of one. *See Tri*, 162 S.W.3d at 556 (providing that civil conspiracy requires two or more people). Accordingly, we hold that the trial court also properly rendered summary judgment on Kenneth and F.W. Services's claim of conspiracy against Garry.

We overrule issue two.

#### 2. The Motion for Traditional Summary Judgment of Chad and His Three Corporations

Third-party defendants Chad and his three corporations moved for traditional summary judgment on both of the tortious interference claims and on the civil conspiracy claim alleged against them on the sole basis that the statute of limitations barred those claims. In issue seven, Kenneth and F.W. Services contend that the trial court erred in granting the traditional

summary-judgment motion of Chad and his three corporations on this basis.

Because we have already held that the trial court properly rendered no-evidence summary judgment on Kenneth and F.W. Services's claims against Chad and his three corporations for tortious interference with an existing contract, tortious interference with prospective business relations, and civil conspiracy, we need not consider whether the trial court erred in granting traditional summary judgment on these same claims. *See Aleman*, 227 S.W.3d at 309 (holding that when summary-judgment order does not specify grounds, we affirm if any is meritorious). Accordingly, we do not reach issue seven.

### Conclusion

We reverse the summary judgment to the extent that it rendered judgment on the following claims:

- Garry's claim against Charles and Texas Staffing for breach of the Agreement based on the transfer of certain accounts to Kenneth or F.W. Services;

- Kenneth's and F.W. Services's counterclaim against Garry for tortious interference with an existing contract between Cary and F.W. Services.

The judgment is affirmed in all other respects. The cause is remanded for proceedings consistent with this opinion.