

## Fourth Court of Appeals
### San Antonio, Texas

## OPINION

No. 04-19-00812-CV

Arty **STRAEHLA** and Ken Kinsey,
Appellants

v.

**AL GLOBAL SERVICES, LLC**,
Appellee

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2018CI22581
Honorable Antonia Arteaga, Judge Presiding

Opinion by:  Rebeca C. Martinez, Justice

Sitting:  Rebeca C. Martinez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: August 26, 2020

AFFIRMED

This is an interlocutory appeal from the trial court's order denying appellants' motions to dismiss based on the Texas Citizens Participation Act ("TCPA").  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011.  We affirm.

### BACKGROUND

Hurricane Maria struck Puerto Rico in September 2017.  After the storm cleared, the Puerto Rico Electrical Power Authority ("PREPA") hired Cobra Acquisitions LLC ("Cobra") to restore

and reconstruct the electrical utility system. Appellant Arty Straehla is the CEO of Cobra, and appellant Ken Kinsey was Cobra's Vice President of Operations.

Cobra hired appellee AL Global Services, LLC ("Alpha Lobo") for security and logistics support. Alpha Lobo subcontracted with Espada Logistics & Security Group, LLC ("Espada Logistics") to perform a portion of the support work. On August 16, 2018, Cobra ended its contract with Alpha Lobo and entered into a contract with Espada Caribbean, LLC ("Espada Caribbean") for the work that Alpha Lobo had previously performed.

This case concerns disputes over the termination of the contract between Cobra and Alpha Lobo and the execution of the contract between Cobra and Espada Caribbean. Alpha Lobo is a limited liability company comprised of three individuals: Jim Jorrie, Craig Charles, and Julian "Jace" Calderas, Jr. Jorrie, along with his ex-wife Jennifer Jorrie ("Jennifer"), also owns Espada Logistics and Espada Caribbean (collectively, the "Espada Companies"). Alpha Lobo sued Jorrie for breach of fiduciary duty, alleging that he usurped Alpha Lobo's business opportunity when he caused his company, Espada Caribbean, to contract with Cobra.

Alpha Lobo also sued Straehla and Kinsey for "Aiding & Abetting/Knowing Participation in Breach of Fiduciary Duty" for their alleged roles in assisting Jorrie. In addition, Alpha Lobo sued Straehla for "Conspiracy to Breach Fiduciary Duty." Straehla and Kinsey filed motions to dismiss these claims pursuant to the TCPA. The trial court denied their motions and related evidentiary objections, and Straehla and Kinsey timely appealed.

**THE TEXAS CITIZENS PARTICIPATION ACT**[1]

*I. Applicable Law and Standard of Review*

The TCPA "protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 587 (Tex. 2015) (orig. proceeding). Under the TCPA, a party may file a motion to dismiss a "legal action" that is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association[.]" TEX. CIV. PRAC. & REM. CODE § 27.003(a). A "legal action" can consist of an entire lawsuit or a single cause of action. *Id.* § 27.001(6).

A three-step burden shifting mechanism is triggered by the filing of a motion to dismiss under the TCPA. *In re Lipsky*, 460 S.W.3d at 586–87. The movant bears the initial burden to show by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the movant's exercise of the right of free speech, the right of association, or the right to petition. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). If the movant meets its initial burden, the burden shifts to the nonmovant to establish by clear and specific evidence a prima facie case for each essential element of its claim. *Id.* § 27.005(c). If the nonmovant fails to meet its burden, the trial court must dismiss the legal action. *See id.* If the nonmovant satisfies its burden, the trial court must nevertheless dismiss the legal action if the movant establishes each essential element of a valid defense to the nonmovant's claim by a preponderance of the evidence. *Id.* § 27.005(d).

In determining whether the nonmovant's claim should be dismissed, the court may consider the pleadings and any supporting and opposing affidavits stating the facts on which the claim or

---

[1] This case is governed by the TCPA as it existed prior to its 2019 amendment because the case was filed before September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 11, 2019 Tex. Sess. Law Serv. 684, 687 (codified at TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001, .003, .005–.007, .0075, .009–.010); *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 129 (Tex. 2019) (applying the prior version of the TCPA to a case filed before September 1, 2019). All citations are to the TCPA as it existed prior to September 1, 2019.

defense is based. *Id.* § 27.006(a). On appeal, the trial court's ruling on a motion to dismiss under the TCPA is reviewed *de novo*, and the pleadings and evidence are viewed in the light most favorable to the nonmovant. *Maldonado v. Franklin*, No. 04-18-00819-CV, 2019 WL 4739438, at *3 (Tex. App.—San Antonio Sept. 30, 2019, no pet.) (mem. op.).

## II. Scope

"The TCPA casts a wide net." *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018). A party may file a motion to dismiss a "legal action" that is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a). Straehla and Kinsey argue that Alpha Lobo's lawsuit is based on, relates to, or is in response to their "exercise of the right of free speech" and their "right of association."

### A. Exercise of the Right of Free Speech

The TCPA provides its own definition of the "exercise of the right of free speech," which is not fully coextensive with the constitutional free-speech right protected by the First Amendment to the U.S. Constitution and article I, section 8 of the Texas Constitution. *See id.* § 27.001(3); *Adams*, 547 S.W.3d at 892. In the TCPA, the "'[e]xercise of the right of free speech' means a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3).

#### 1. Communication

"In order for a movant to invoke the TCPA, there must first be a communication." *Krasnicki v. Tactical Entm't, LLC*, 583 S.W.3d 279, 283 (Tex. App.—Dallas 2019, pet. denied). "'Communication' includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(1). Alpha Lobo disputes whether a communication was made because Straehla

and Kinsey have not identified a specific communication forming the basis of Alpha Lobo's claims. Alpha Lobo also asserts that it "did not file suit against [Kinsey and Straehla] based on a communication made by Kinsey or Straehla."

The basis of a legal action is determined by the plaintiff's allegations. *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017). Indeed, "the plaintiff's petition . . . is the best and all-sufficient evidence of the nature of the action." *Id.* (citation omitted). "When it is clear from the plaintiff's pleadings that the action is covered by the Act, the defendant need show no more." *Id.*

We hold that Alpha Lobo alleged that Straehla and Kinsey made a "communication," as defined by the TCPA, by stating that fact in its petition. Alpha Lobo's petition alleges:

> Mr. Straehla provided substantial assistance to Mr. Jorrie in connection with his breaches of fiduciary duties by participating in Mr. Jorrie's scheme, *including by actively communicating* and generating plans with Mr. Jorrie and/or one or more of the Espada Companies for security work on the Puerto Rico Project to be done by one of the Espada Companies and directing work on the Puerto Rico Project to one or more of the Espada Companies instead of Alpha Lobo.

(emphasis added).[2] While the petition does not identify a particular communication, under a plain reading, the petition alleges that Straehla and Kinsey made one or more communications with Jorrie in order to "generat[e] plans." Further, although the medium of the communication is not specified, this vagueness is immaterial. "Almost every imaginable form of communication, in any medium, is covered." *Adams*, 547 S.W.3d at 894.

### 2. Matter of Public Concern

We also hold that the alleged communications were "made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3). A "'[m]atter of public concern' includes an issue related to . . . environmental, economic, or community well-being; . . . the government; . . . or . . . a good, product, or service in the marketplace." *Id.* § 27.001(7)(A)–(E).

---

[2] The allegations are similar as to Kinsey and similar as to the conspiracy claim against Straehla.

The TCPA allows "[a] mere 'tangential relationship' between the communication and the matter of public concern[.]" *Maldonado*, 2019 WL 4739438, at *7 (quoting *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (per curiam)). The communications need not "specifically mention" one of the enumerated concerns, and the TCPA can reach a business's internal matters even if the communication was not made in a public forum. *See ExxonMobil*, 512 S.W.3d at 900–01 (holding statements, although private and among employees, were a matter of public concern).

Here, the rebuilding of the Puerto Rican electrical utility system was undoubtedly a matter of public concern because it was an issue related to the "environmental, economic, or community well-being" of the island and its residents. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)(B); *cf. Mission Wrecker Serv., S.A., Inc. v. Assured Towing, Inc.*, No. 04-17-00006-CV, 2017 WL 3270358, at *4 (Tex. App.—San Antonio Aug. 2, 2017, pet. denied) (mem. op.) (holding conversations regarding the agreement a city had with a towing service related to matters of public concern because the communications "relat[ed] to the manner in which the government operates"). In addition, Cobra's contract to repair electrical services on the island was itself a matter of public concern because it was "an issue related to . . . the government." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)(C); *cf. Mission Wrecker*, 2017 WL 3270358, at *4 ("[T]he award of public contracts is almost always a public matter and an issue of public concern." (citation omitted)). The subcontracts for security and logistics services that lie at the heart of this case relate to the rebuilding of the electrical power system, and the allegedly tortious communications by Straehla and Kinsey concern termination of one such contract and the formation of another.

Although Alpha Lobo is correct when it asserts that this case concerns the fortunes of private parties, its observation misses the point. Where, as here, the communications are at least "tangentially" related to "environmental, economic, or community well-being" and "the

government," the TCPA standard is satisfied, even if private fortunes are also at stake. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7)(A)–(B); *ExxonMobil*, 512 S.W.3d at 900.

We hold that Alpha Lobo's claims implicate the exercise of Straehla's and Kinsey's right of free speech under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a). Because we so hold, we need not decide whether the claims also implicate the right of association. *See ExxonMobil*, 512 S.W.3d at 902.

III. *Prima Facie Case*

Because Straehla and Kinsey have demonstrated that the TCPA applies to Alpha Lobo's claims, the burden shifts to Alpha Lobo to establish by clear and specific evidence a prima facie case for each essential element of its claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

A. *Standard of Clear and Specific Evidence*

Neither the TCPA nor common law define "clear and specific evidence." *In re Lipsky*, 460 S.W.3d at 590. "The words 'clear' and 'specific' in the context of [the TCPA] have been interpreted respectively to mean, for the former, 'unambiguous,' 'sure,' or 'free from doubt' and, for the latter, 'explicit' or 'relating to a particular named thing.'" *Id.* (quotations omitted). In contrast, "prima facie case" has a traditional legal meaning. *Id.* "It refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Id.* "It is the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (quotations omitted). "Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 355 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223–24 (Tex. 2004) (orig. proceeding) (per curiam)). Ultimately, under the TCPA standard, "a plaintiff must provide enough detail to show the factual basis for its claim," and although "the TCPA initially demands more information about

the underlying claim, the Act does not impose an elevated evidentiary standard or categorically reject circumstantial evidence." *In re Lipsky*, 460 S.W.3d at 591. "In short, [the TCPA] does not impose a higher burden of proof than that required of the plaintiff at trial." *Id.*

### B. Knowing Participation in Breach of Fiduciary Duty[3]

"It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942). The elements of a knowing-participation claim are: (1) the existence of a fiduciary duty owed by a third party to the plaintiff; (2) the defendant knew of the fiduciary relationship; and (3) the defendant was aware of his participation in the third party's breach of its duty. *Darocy v. Abildtrup*, 345 S.W.3d 129, 138 (Tex. App.—Dallas 2011, no pet.). Knowing participation in breach of fiduciary duty is a derivative claim, requiring an underlying breach of fiduciary duty, in which the defendant knowingly participates. *See Kinzbach Tool Co.*, 160 S.W.2d at 514. In this case, the alleged underlying breach is Jorrie's breach of his purported fiduciary duty to Alpha Lobo. The parties dispute whether Alpha Lobo has made a prima facie case that Jorrie breached any fiduciary duty he owed to Alpha Lobo.

### 1. Underlying Breach of Fiduciary Duty Claim against Jorrie

The elements of a claim for breach of fiduciary duty are: "(1) the existence of a fiduciary relationship between the plaintiff and defendant; (2) the defendant's breach of the fiduciary duties

---

[3] Alpha Lobo styled its claim: "Aiding & Abetting/Knowing Participation in Breach of Fiduciary Duty." It is clear from the petition that Alpha Lobo intended to assert only one cause of action for "Aiding & Abetting/Knowing Participation in Breach of Fiduciary Duty," rather than two causes of action—one for "Aiding & Abetting" and the other for "Knowing Participation in Breach of Fiduciary Duty." Alpha Lobo discusses only the elements of a knowing-participation claim in its brief. Straehla and Kinsey do not dispute that knowing participation is a viable cause of action under Texas law. We, therefore, consider Alpha Lobo's claims to be for knowing participation in breach of fiduciary duty, and we do not separately consider aiding-and-abetting claims. We offer no opinion on whether an aiding-and-abetting cause of action is viable under Texas law.

arising from that relationship; and (3) injury to the plaintiff, or benefit to the defendant, resulting from that breach." *Plotkin v. Joekel*, 304 S.W.3d 455, 479 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

### a. Existence of a Fiduciary Relationship Between Jorrie and Alpha Lobo

The parties contest the first element as to whether Jorrie owed fiduciary duties to Alpha Lobo. Alpha Lobo is a Texas limited liability company comprised of three members: Jorrie, Charles, and Calderas. *See* TEX. BUS. ORGS. CODE ANN. §§ 101.001–101.622 (providing the standards governing Texas limited liability companies). As a business form, an LLC "afford[s] the corporation-like benefit of limited liability but with partnership tax treatment." *Shook v. Walden*, 368 S.W.3d 604, 613 n.10 (Tex. App.—Austin 2012, pet. denied). While corporations and partnerships impose fiduciary obligations on corporate executives and partners, respectively, the Texas Business Organizations Code does not directly address the duties a manager or member owes to the LLC. *See* TEX. BUS. ORGS. CODE ANN. §§ 101.001–101.622; *In re Lau*, No. 11-40284, 2013 WL 5935616, at *27 (Bankr. E.D. Tex. Nov. 4, 2013); *see also Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998) ("We have long recognized as a matter of common law that the relationship between partners is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise.") (internal citation, brackets, and ellipses omitted); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963) (stating that a corporate fiduciary owes a duty of loyalty and "is under obligation not to usurp corporate opportunities for personal gain"). The Code provides:

> The company agreement of a limited liability company may expand or restrict any
> duties, including fiduciary duties, and related liabilities that a member, manager,

officer, or other person has to the company or to a member or manager of the company.

TEX. BUS. ORGS. CODE ANN. § 101.401.

Although we do not have the Alpha Lobo LLC agreement in the record, we presume, based on the assumption inherent in section 101.401 of the Business Organizations Code that, Jorrie owed the same fiduciary duties that a corporate executive or partner would owe a corporation or partnership, unless the LLC agreement shows otherwise. *See Cardwell v. Gurley*, No. 05-09-01068-CV, 2018 WL 3454800, at *5–6 (Tex. App.—Dallas July 18, 2018, pet. denied) (mem. op.) (holding there was sufficient evidence to support a trial court finding that a defendant owed fiduciary duties to an LLC as a managing member because defendant admitted he owed fiduciary duties and the Business Organizations Code "presume[s] the existence of fiduciary duties") Accordingly, Alpha Lobo's failure to include the LLC agreement in our record is not fatal to its attempt to make a prima facie case on the element of a fiduciary relationship, as Straehla and Kinsey argue. Alpha Lobo also alleges the existence of fiduciary duties in its petition.

We hold that Alpha Lobo has established a prima facie case for the existence of a fiduciary relationship between Jorrie and Alpha Lobo. As with corporate executives and partners, Jorrie, as a member of an LLC, and as alleged in the petition, owed a duty of loyalty to Alpha Lobo and a duty not to usurp corporate opportunities. *See Bohatch*, 977 S.W.2d at 545; *Int'l Bankers*, 368 S.W.2d at 577.

### *b. Breach of Fiduciary Duties and Injury to Alpha Lobo*

Viewing the pleadings and evidence in the light most favorable to Alpha Lobo, the record establishes a prima facie case that Jorrie breached his fiduciary duties to Alpha Lobo and injured the company.[4]

Alpha Lobo is comprised of three members—Jorrie, Charles, and Calderas—with equal ownership of the company. The circumstances of Jorrie's alleged breach of his fiduciary duties began in the immediate aftermath of Hurricane Maria. In late September 2017, the three members of Alpha Lobo met with Straehla and Kinsey for approximately sixteen hours to negotiate a contract. In October 2017, Alpha Lobo and Cobra entered into a contract for Alpha Lobo to provide security services on a business-development trip to Puerto Rico. Jorrie signed for Alpha Lobo, and Straehla signed for Cobra.

In October 2017, Straehla, Kinsey, Jorrie, and Calderas traveled to Puerto Rico by private plane. Calderas used his contacts and credentials as a former member of the United States Department of Homeland Security to gain access to the government's disaster-response command center on the island. The traveling party also visited PREPA's headquarters. On October 19, 2017, Cobra entered into a contract with PREPA to perform work related to the restoration of the island's power grid. The next day, Cobra and Alpha Lobo entered into a Master Services Agreement ("MSA"). Under this agreement, Alpha Lobo was to provide security services and logistics support to Cobra. Jorrie and Straehla again executed the contract on behalf of their

---

[4] Straehla and Kinsey objected to the trial court's failure to strike three paragraphs from affidavits executed by Charles and Calderas that Alpha Lobo submitted as evidence. Generally, the challenged statements assert facts similar to those found in the petition's allegations and in the unchallenged evidence that the parties submitted. In this opinion, we state only facts from the pleadings and unchallenged evidence; we do not rely on any of the challenged affidavit statements in our analysis. Accordingly, we overrule appellant's evidentiary issues because, even if the trial court's evidentiary rulings were erroneous, we cannot conclude that any error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 907 (Tex. 2000) (overruling evidentiary issue because, even if the trial court erred by admitting evidence, "[t]he jury had sufficient evidence on which to base its verdict even disregarding the [challenged evidence]").

respective companies.  Alpha Lobo subcontracted some of its work under the MSA to Espada Logistics, the company Jorrie owns with his ex-wife Jennifer.

On December 7, 2017, Jorrie emailed Charles and Calderas and offered to run the day-to-day operations for Alpha Lobo in Puerto Rico.  Around that time, Jennifer began a sexual relationship with Kinsey.  This relationship had the potential to benefit the Espada Companies because Kinsey, as Cobra's Vice President of Operations, could provide input on Cobra's subcontractor selection.  By the end of January 2018, Jorrie replaced the Espada Logistics project manager with Jennifer, and Jennifer was assigned to work from Cobra's headquarters in Puerto Rico after Kinsey requested the assignment.

On January 30, 2018, Jennifer formed Espada Caribbean, as a Puerto Rican limited liability company.  On February 9, 2018, Jennifer executed a corporate resolution for Espada Caribbean to install Jorrie as Chief Executive Officer and to assign Jorrie a 67% ownership interest in the company.  During this time, in early 2018, Alpha Lobo assigned Jorrie the task of obtaining a security license for Alpha Lobo in Puerto Rico.  Jorrie did not; however, in mid-February 2018, Jorrie acquired a security license for Espada Caribbean, which enabled Espada Caribbean to legally provide security services in Puerto Rico.

On March 7, 2018, Jorrie attempted to renegotiate Alpha Lobo's subcontract with Espada Logistics to increase Alpha Lobo's payments to Espada Logistics.  Charles and Calderas rejected the proposal.  Calderas responded by email that Alpha Lobo had obtained its Puerto Rican work through his and Charles's contacts and that the three members of Alpha Lobo had agreed to an equal split of the profits based on the understanding that Espada Logistics would be a subcontractor.  Jorrie, in turn, responded by noting the "immensely valuable" channel of communication Jennifer held, by the nature of her relationship with Kinsey.  Jorrie added: "Whether we like the origin or nature of that relationship, it remains undisputed that he is

protective of her interests." Jorrie concluded: "I can not [sic] overstate the potential devolution of the arrangement that could possible [sic] occur if there are not fruitful renegotiations."

Two days later, on March 9, 2018, Jorrie executed an amendment to the MSA on behalf of Alpha Lobo. The amendment provided that the MSA would be valid until August 15, 2018. Beyond that date, the MSA would continue in force and effect if certain conditions were present, including the existence of unfulfilled obligations under the agreement between Cobra and PREPA.[5] Three days after signing the amendment, on March 12, 2018, Jorrie again raised the "desire to flip the profit share to 66% Espada and 33% Alpha Lobo." Charles and Calderas declined to do so.

On March 20, 2018, Jorrie met with Cobra's President, Keith Ellison. Straehla was in Cobra's Puerto Rican headquarters on that same date. After the meeting between Ellison and Jorrie, an executive with the Espada Companies emailed Kinsey:

> Keith and Jim's meeting was successful without incident. Jim informed Keith that I will be taking over ESPADA Security LLC and will be drafting the proposal for the new Espada Caribbean LLC / COBRA direct contract.

Kinsey testified in his deposition that he was aware of discussions, at that time, for a direct relationship between Cobra and one of the Espada Companies.

Nearly a month later, on April 16, 2018, the three members of Alpha Lobo met. The meeting minutes reflect:

> Jim interrupted and stated that he needed to discuss something with us. Jim stated that there has been a change in the relationship between his ex-wife Jennifer [Jorrie] and the COO of Cobra Energy Ken Kensey [sic]. Jace [Calderas] and Craig [Charles] are aware that there is an intimate relationship between the two that we have been told was very amicable. They hold hands in public, kiss in public and are considered an item in Puerto Rico. Jim wanted to let us know that Jennifer told him the [sic] Ken raped her. Jace and Craig stopped Jim and stated that if he really thought that then he should go to the authorities. Jim then wanted to talk about

---

[5] The parties dispute whether the MSA terminated on August 15, 2018. We take no position on the matter and our summary of the amendment should not be understood as a contract interpretation.

changing the profit split between Alpha Lobo and Espada. Craig replied that that agenda item was Number 6 and that we should just stay on track. Jim became very agitated and would not speak of other items.

The meeting continued briefly, and Calderas and Charles rejected Jorrie's request to change the profit-sharing agreement when brought up a second time. According to the minutes, Jorrie then "got up, pointed his finger at [Charles and Calderas] and stated, 'you are going to regret that[.]' He then left the meeting." In the weeks that followed, Charles and Calderas continued to work on Puerto Rican projects for Alpha Lobo.

After the April 16, 2018, member's meeting, an executive with the Espada Companies circulated a letter informing security contractors that Espada Caribbean was negotiating a new contract directly with Cobra. During this time, Jorrie bought "Espada Caribbean" magnets with an Alpha Lobo credit card and placed the magnets on all Alpha Lobo vehicles in Puerto Rico.

On July 10, 2018, an executive with the Espada Companies emailed Kinsey and other members of Cobra's senior management team. The executive wrote:

> We are approaching the 30-day mark until the end of our current contract. . . . If I am going to transition this project to a Puerto Rico LLC, compliant with all local laws and regulations, it will require a 30-day transition. . . . I would appreciate any direction "Stay or Go" for ESPADA that you can give.

On July 23, 2018, the Espada Companies' executive again emailed Kinsey and other members of Cobra's senior management team, with a copy to Jorrie, clarifying that the proposed work regarded "a direct contract with ESPADA Caribbean and not Alpha Lobo."

On July 25, 2018, Charles emailed Cobra's senior management team, with a copy to Jorrie and Calderas, inquiring, "Are there any possible extensions or follow on contracts? Or is August 15 a hard shut down date?" A Cobra executive responded: "We are tracking with the RFP [Request for Proposal] process and shall be providing submitted guidance to all potential bidders by end of week or early next week." Although this email references an RFP process, there is no evidence

that Cobra utilized such a process. Straehla testified in his deposition that he never saw any RFP and that he did not know what, if any, cost savings would be gained by contracting with Espada Caribbean over Alpha Lobo. Straehla and Kinsey did not identify any work-performance complaints Cobra had with Alpha Lobo as a subcontractor.

On July 27, 2018, Kinsey texted Jennifer: "Us cutting out Alpha Lobo saves a ton." According to Kinsey, "us" referred to Jennifer and possibly Jorrie.

Alpha Lobo alleged in its petition:

> Upon information and belief, Mr. Jorrie made it clear to Cobra officials . . . that if Cobra and Mr. Straehla did not agree to assist his efforts to obtain work on the Puerto Rico Project for one or more of the Espada Companies, Ms. Jorrie would publicly claim that she had been raped by Mr. Kinsey. If that were to occur, Cobra, Mammoth [Cobra's parent company], and their top officials would be faced with a public scandal that could: (i) damage their reputations (ii) have negative personal consequences, and (iii) have negative implications on their business interests, including relating to the Puerto Rico Project.

Kinsey testified at his deposition that a colleague told him, in late July or early August 2018, that the colleague "had heard that Jennifer may be filing rape charges against" Kinsey.

On August 14, 2018, at 8:02 a.m., a member of Cobra's senior management team informed Alpha Lobo that Cobra would likely need to extend the MSA by a couple of weeks. Jorrie, Charles, and Calderas then discussed by email the rate that Espada Logistics would charge Alpha Lobo if the subcontract were extended. The rate Espada Logistics quoted Alpha Lobo was the same rate that Cobra would pay Alpha Lobo. After receiving the quote, Alpha Lobo sought and obtained a lower quote from another subcontractor. By email at 10:11 p.m., a member of Cobra's senior management stated to Charles, with in-house counsel copied: "We will be executing a 30-day extension. [In-house counsel] will be drafting an amendment to the contract and sending your way soon." Despite this email, on August 15 or 16, 2018, Straehla signed a contract with Espada Caribbean for the security and logistics work that Alpha Lobo had previously performed.

By these allegations and evidence, Alpha Lobo has established a prima facie case that Jorrie breached his fiduciary duty of loyalty to Alpha Lobo and duty not to usurp corporate opportunities. Viewed in the light most favorable to Alpha Lobo, the record shows that Jorrie placed the interests of his Espada Companies over the interests of Alpha Lobo in a successful attempt to secure a direct contract between Cobra and Espada Caribbean. The record shows that, in early 2018, Jorrie's business partner and ex-wife, Jennifer, incorporated Espada Caribbean and, thereafter, Jorrie obtained a security license for Espada Caribbean but failed to do so for Alpha Lobo, as it requested. Emails show that Espada Company executives pursued a direct contract with Cobra. One such email reports that Jorrie had a successful meeting with Cobra's President and that Jorrie directed an Espada Company executive to draft a proposal for a direct contract with Cobra after the meeting. While negotiations progressed, Jorrie purchased assets for Espada Caribbean with Alpha Lobo funds. Meanwhile, Jorrie attempted to renegotiate a more favorable contract between Alpha Lobo and Espada Logistics. While renegotiating, Jorrie repeatedly warned Charles and Calderas that they would regret their failure to reach a renegotiated agreement; however, Jorrie did not disclose that his Espada Companies were pursuing a contract to replace the MSA between Cobra and Alpha Lobo.

The record shows that on August 15, 2018, Alpha Lobo sought to extend its relationship with Cobra. On this date, Jorrie was a party to internal Alpha Lobo emails regarding contract renewal. By these emails, Jorrie learned that Alpha Lobo had secured a lower bid than the bid submitted by Espada Logistics for security and logistics work that Alpha Lobo intended to subcontract. Ultimately, on that day or the next, Cobra signed a contract with Espada Caribbean and did not extend its contract with Alpha Lobo.

We hold this evidence is sufficient to establish Jorrie's breach. *See CBIF Ltd. P'ship v. TGI Friday's Inc.*, No. 05-15-00157-CV, 2017 WL 1455407, at \*14–15 (Tex. App.—Dallas Apr.

21, 2017, pet. denied) (mem. op.) (holding that a breach of fiduciary duty was shown by evidence that a partner pursued its own self-interest by threatening its partners with total loss unless paid more); *Darocy*, 345 S.W.3d at 138 (holding that "fail[ure] to manage the day-to-day operations of the ventures with loyalty and fidelity" was evidence of a breach of fiduciary duty).

Alpha Lobo has also established a prima facie case that it was injured by Jorrie's breach. Alpha Lobo's evidence can support a rational inference that damages include lost income from continued work in Puerto Rico and money lost from Jorrie's improper use of Alpha Lobo funds. *See Deuell v. Tex. Right to Life Comm., Inc.*, 508 S.W.3d 679, 689 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Under the TCPA, [the nonmovant] only had to adduce evidence supporting a rational inference as to the existence of damages, not their amount or constituent parts." (citing *In re Lipsky*, 460 S.W.3d at 590)).

### 2. Knowing-Participation Claims against Straehla and Kinsey

A knowing-participation claim requires the existence of a fiduciary duty owed by a third party to the plaintiff. *Darocy*, 345 S.W.3d at 138. As we held above, Jorrie owed Alpha Lobo fiduciary duties, which Jorrie breached. We next consider, for the knowing-participation claims, whether Straehla and Kinsey knew of the fiduciary relationship between Jorrie and Alpha Lobo and whether Straehla and Kinsey were aware of their participation in Jorrie's breach. *See id.* We hold the evidence is sufficient to establish a prima facie case as to each of these elements for Straehla and Kinsey.

### a. Knowledge of Jorrie's Fiduciary Duties

We agree with Alpha Lobo that circumstantial evidence establishes a prima facie case that Straehla and Kinsey knew Jorrie owed fiduciary duties to Alpha Lobo. *See JSC Neftegas-Impex v. Citibank, N.A.,* 365 S.W.3d 387, 411 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (approving a jury instruction that provided that "knowingly" means actual awareness and that

"[a]ctual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness").

The evidence shows that, between October 2017 and March 2018, Straehla and Jorrie executed three contracts on behalf of Cobra and Alpha Lobo, respectively. On two contracts, Jorrie listed his title as "Manager," and on the third, he listed his title as "Principal." Straehla also met with Jorrie and the other two Alpha Lobo members for approximately sixteen hours prior to the execution of any contract with Alpha Lobo. Straehla, Jorrie, and Calderas traveled to Puerto Rico together by private plane after their initial meetings, and in Puerto Rico, Straehla, Kinsey, Jorrie, and Calderas spent approximately thirty-six hours together in October 2018. Straehla is Cobra's CEO and sits on the Board of Directors for Cobra's publicly-traded parent company. Cobra is an LLC, and Straehla is a manager for eleven of the parent company's LLCs that are authorized to do business in Texas. A trier-of-fact could reasonably infer from this evidence that Straehla had actual awareness that Jorrie owed fiduciary duties to Alpha Lobo as a managing member of the company. *See Samsung Elecs. Am., Inc. v. Yang Kun Chung*, No. 3:15-CV-4108-D, 2017 WL 635031, at *12 (N.D. Tex. Feb. 16, 2017) (holding that it could reasonably be inferred that a company had knowledge of fiduciary duties owed by employees of another company based on "experience in the industry").

The evidence relevant to Kinsey also supports a rational inference that Kinsey had knowledge that Jorrie owed fiduciary duties to Alpha Lobo. The evidence shows that Kinsey received emails from Jorrie that stated Jorrie was a principal of Alpha Lobo, and Jorrie was Kinsey's primary point of contact with Alpha Lobo. Kinsey was Vice President of Cobra, which, like Alpha Lobo, is a limited liability company. From Kinsey's significant involvement with Alpha Lobo and his business experience, it is reasonable to infer that he understood that Jorrie

owed fiduciary duties to Alpha Lobo, a company for which he was a member and manager.  *See id.*

### b.  Awareness of Participation in Breach of Fiduciary Duties

The third essential element of a knowing-participation claim is that a defendant have actual awareness of his participation in the breach of fiduciary duties.  *See Darocy*, 345 S.W.3d at 138. Here, the evidence is sufficient to draw the rational inference that both Straehla and Kinsey were aware of their participation in Jorrie's breach.

The suspicious circumstances surrounding Cobra's abrupt pivot from a contract with Alpha Lobo to one with Espada Caribbean, suggest that Straehla executed the contract on August 15 or 16 to favor Jorrie, even through Straehla was aware of Jorrie's fiduciary duties.  *See Milligan, Tr. for Westech Capital Corp. v. Salamone*, No. 1:18-CV-327-RP, 2019 WL 1208999, at *9 (W.D. Tex. Mar. 14, 2019) (holding a factfinder could infer that a law firm knew the agreement it drafted, "in suspicious fashion," was not in a company's interest and, therefore, that in drafting the agreement, the law firm was helping a company director self-deal, in violation of the director's fiduciary duties).

As detailed above, the evidence shows that Straehla had significant personal contacts with Jorrie.  Evidence also shows that Jorrie may have had an opportunity on March 20, 2018, to discuss his plan for a direct Cobra-Espada Caribbean contract with Straehla.  Jorrie warned Charles and Calderas after March 20, 2018, that they would regret their failure to renegotiate the subcontract with Espada Logistics; Jorrie's warnings plausibly suggest that Jorrie may have come to an understanding with Straehla.  Neither Straehla nor Kinsey could identify any problems with Alpha Lobo's work performance or any cost savings obtained by contracting directly with Espada Caribbean, and neither was aware if an RFP process had occurred.  Ultimately, Straehla signed the

contract with Espada Caribbean, despite other Cobra senior executives stating to Charles, on the night of August 15, 2018, that Cobra would execute an extension of the MSA with Alpha Lobo.

In the absence of evidence as to a business purpose for the change, Alpha Lobo suggests that a possible motive was to conceal a scandal. According to the petition: "Jorrie made it clear to Cobra officials . . . that if Cobra and Mr. Straehla did not agree to assist his efforts to obtain work on the Puerto Rico Project for one or more of the Espada Companies, Ms. Jorrie would publicly claim that she had been raped by Mr. Kinsey."

Altogether, a trier-of-fact could rationally infer from this evidence that Straehla was aware of his participation in Jorrie's breach of his fiduciary duties.

Likewise, the evidence is sufficient as to Kinsey. In addition to the evidence just detailed, the evidence shows that Kinsey was in direct communication with Espada Company executives, including Jennifer and Jorrie. Kinsey knew Jorrie was affiliated with Espada Caribbean, and Kinsey had a sexual relationship with Jennifer, who owned Espada Caribbean with Jorrie. Kinsey texted Jennifer: "Us cutting out Alpha Lobo saves a ton." *See Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 673 (S.D. Tex. 2010) (holding allegations a defendant knew how an insider would benefit financially from a transaction was evidence that the defendant knew the insider was breaching his fiduciary duty to his employer through the transaction).

In addition, evidence suggests that Kinsey may have been motivated to facilitate a Cobra-Espada Caribbean contract to forestall Jennifer from filing criminal charges against him. According to a colleague, Jennifer was contemplating filing rape charges; separately, Jorrie informed Charles and Calderas about Jennifer's accusation of rape.

We hold this evidence supports a prima facie case that Kinsey was aware of his participation in Jorrie's breach of his fiduciary duties.

In sum, we hold Alpha Lobo has established by clear and specific evidence a prima facie case for each essential element of its knowing-participation claims against Straehla and Kinsey.

### C. Conspiracy Claim against Straehla

Alpha Lobo alleges a conspiracy claim against Straehla only. As with knowing participation, conspiracy is a derivative claim, requiring an underlying tort. *See Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 762 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). The claim has five elements: "(1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). "An actionable civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Id.*

The same evidence Alpha Lobo relies on to establish its claim for Straehla's knowing-participation claim also suffices to establish a prima facie case for conspiracy. From the suspicious circumstances surrounding the formation of the Cobra-Espada Caribbean contract, we can infer a common plan held by Jorrie and Straehla to replace Alpha Lobo with Espada Caribbean as Cobra's subcontractor. *See Int'l Bankers*, 368 S.W.2d at 581 ("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators."). Evidence also establishes that Jorrie and Straehla had the opportunity to develop and execute a common plan, and both stood to benefit—Jorrie financially and Straehla, as alleged, by "avoid[ing] the prospect of a public scandal." *See id.* at 582 ("Inferences of concerted action may be drawn from joint participation in

the transactions and from enjoyment of the fruits of the transactions[.]").  Circumstantial evidence from March 20, 2018, suggests that Straehla and Kinsey had an opportunity to reach a meeting of the minds, and, from events after that date, we can reasonably infer that they did.  Evidence shows Jorrie disregarded his fiduciary obligations to Alpha Lobo, and he accomplished his goal when Straehla caused Cobra to execute the Cobra-Espada Caribbean contract.  Alpha Lobo's harm from the alleged scheme included a lost business opportunity and money damages from the improper use of Alpha Lobo funds.

On this record, we hold Alpha Lobo has established by clear and specific evidence a prima facie case for the essential elements of its conspiracy claim.  *See Westergren v. Jennings*, 441 S.W.3d 670, 683–84 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (holding that "[w]hile no one piece of this evidence . . . shows a conspiracy to use Westergren's plans and cut him out of the development, . . . these circumstances and the potential inferences arising therefrom provide a sufficient factual basis for his allegation of a conspiracy").

## *IV.  Defenses*

Step three of our analysis requires that we examine defenses asserted by Straehla and Kinsey after Alpha Lobo has established a prima facie case for its claims.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d).  Dismissal of the claims is required if Straehla and Kinsey establish each essential element of a valid defense to the claims by a preponderance of the evidence.  *See id.*

Straehla and Kinsey argue they are entitled to rely on the MSA's damages limitation as a defense because they are agents of Cobra, a signatory to the MSA.

MSA section 12.2.7 provides:

Neither ALPHA [Lobo] nor COBRA, shall be liable to each other for any:

(i) Consequential, indirect and/or pure economic loss;

(ii) Loss of profit;

(iii) Damage to goodwill;

(iv) Aggravated, punitive and/or exemplary damages;

(v) Business interruption, loss of business, loss of contract and/or loss of opportunity; and/or

(vi) Loss of use suffered by ALPHA [Lobo] or COBRA howsoever arising out of, or in connection with this Agreement and/or otherwise (whether arising due to breach of contract, tort (including negligence), breach of statutory duty, breach of common law and/or under any other legal basis)[.]

By its terms, this provision limits only the measure of damages; it does not release claims. Therefore, Straehla and Kinsey have not established a valid defense to the claims. *Cf. Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230–33 (Tex. 2019) (sustaining argument that, even if plaintiffs could recover on their fraud claim, they were not entitled to punitive damages because the parties had agreed to a damages-limitation clause in a limited warranty); *Cummins v. Lollar*, No. 07-16-00337-CV, 2018 WL 2074636, at *8 (Tex. App.—Amarillo May 3, 2018) (mem. op.) ("The only consequence for failing to make a request for retraction within ninety days [under the Texas Defamation Mitigation Act] is preclusion of recovery of exemplary damages, not dismissal.").[6]

Next, Straehla asserts a legal-justification defense. For support, he cites cases in which the claim at issue is tortious interference with an existing contract. *See Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996); *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 857 (Tex. App.— Houston [14th Dist.] 2001, pet. denied). According to Straehla: "Legal justification applies when a party's alleged tortious acts are merely an exercise of its own contractual rights, regardless of motive." Here, even if we assume the defense is valid for conspiracy and knowing-participation

---

[6] We take no position on the matter of whether Straehla and Kinsey can avail themselves of the damage-limitation provision as agents of Cobra.

claims, the defense does not apply to defeat the claims because material fact issues exist as to whether Straehla knowingly assisted Jorrie in more ways than just signing the contract. *See Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997) (requiring there to be no genuine issue of material fact to establish a claim or defense as a matter of law). The parties contest whether Straehla discussed with Jorrie a Cobra-Espada Caribbean contract beginning in early 2018. Evidence shows that Jorrie met with Cobra's President on March 20, 2018, while Straehla also was on the island, and the parties dispute whether Jorrie conferred with Straehla on or around that date.

Because Straehla and Kinsey have not established their defenses as a matter of law, the trial court did not err in denying their motions under the TCPA.

## CONCLUSION

We hold the trial court did not err by denying Straehla's and Kinsey's motions to dismiss under the TCPA. Accordingly, we affirm the trial court's judgment.

Rebeca C. Martinez, Justice